Frank C. PASTERNAK; Judith Pasternak (92–1681/1682); Anthony J. Cutaia; Diane Cutaia; David G. Koehlinger (92–1681), Petitioners–Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.

Nos. 92–1681, 92–1682.

United States Court of Appeals, Sixth Circuit.

Argued March 15, 1993.

Decided April 8, 1993.

Rehearing Denied June 7, 1993.

Frederick A. Patmon, Detroit, MI, Clarence B. Tucker, Sr. (argued and briefed), Detroit, MI, for petitioners-appellants.

Thomas J. Clark, Trial Attorney (argued), U.S. Dept. of Justice, Tax Div., Gary R. Allen, Acting Chief (briefed), Gilbert S. Rothenberg, U.S. Dept. of Justice, Appellate Section, Tax Div., Washington, DC, for respondent-appellee in No. 92–1681.

Thomas J. Clark, Trial Attorney (argued), U.S. Dept. of Justice, Tax Div., Abraham N.M. Shashy, Jr., Chief Counsel, I.R.S. Office of Chief Counsel, Gary R. Allen, Acting Chief (briefed), Gilbert S. Rothenberg, U.S. Dept. of Justice, Appellate Section, Tax Div., Washington, DC, for respondent-appellee in No. 92–1682.

Before: NELSON, Circuit Judge; and PECK and CONTIE, Senior Circuit Judges.

CONTIE, Senior Circuit Judge.

Petitioners-appellants, Frank C. Pasternak and Judith Pasternak; Anthony J. and Diane Cutaia; and David G. Koehlinger,

appeal a Tax Court decision upholding tax deficiencies and penalties against them for the taxable years 1981 and 1982 issued by the Commissioner of Internal Revenue, respondent-appellee.

## I.

Petitioners are persons who invested in various master recording leasing programs. Four corporations were set up by Misters Barbret, Labbadie, Rosanova, and the Detroit law firm of Patmon and Young ("the promoters"), which became the general managing partner of four limited partnerships. The promoters created three limited partnerships in late 1981 (Pop Phonomasters, Ltd., Soul Phonomasters, Ltd., New America Phonomasters, Ltd.) and one in 1982 (Rock Kandy Phonomasters, Ltd.). The alleged purpose of each limited partnership was to acquire and then lease to a group of investors the master recordings of an artist containing enough songs to constitute an album through entities designated as co-tenancies. It was then left up to the co-tenancies to process, press, distribute, and market the albums and other derivatives of the master recordings which had been leased. On December 28, 1981, the Pop, Soul, and New America Phonomasters limited partnerships each acquired master recordings of a designated artist with an initial purchase price of from $50,000–$10,-000. Although the stated purchase price for the recordings, according to the purchase agreements, required the payment of additional fees of from $27,000 to $50,000 and of royalties, there is no evidence that the second fees and royalties were ever paid. For the Rock Kandy Phonomasters limited partnership, there is insufficient evidence that enough master recordings to constitute an album existed for it in 1982.

The promoters then formed four entities or "co-tenancies" named Pop Phonomasters Leasing, New America Phonomasters Leasing, Soul Phonomasters Leasing, and Rock Kandy Phonomasters Leasing for the purpose of leasing the master recordings to investors, such as the taxpayers herein. An investor joined one of the co-tenancies as a co-tenant by signing an acceptance to an offer to participate in the co-tenancy, an operating agreement, and a Phonomasters lease. Each co-tenancy leased the master recordings, which were to comprise an album of a designated artist, from either the Pop, Soul, New America, or Rock Kandy limited partnerships. About 45 investors invested in each co-tenancy. The leases granted the lessee-investors the exclusive right to exploit the recordings in the United States for a three-year-term and required a fixed rental payment and the payment of a fee to a marketing agent for a total of $275,000 (at least $435,000 for Rock Kandy). The lease for each co-tenancy stated that the "stipulated loss value" of the recordings were $3,370,000 ($6,144,400 for Rock Kandy), and that the co-tenancies, which bore the full risk of loss, were required to insure the recordings for at least that amount.

The co-tenants herein signed the acceptance of the offer and invested the following amounts to lease the master recordings from the respective Phonomasters limited partnerships.

| Year | Taxpayer | Co–Tenancy | Amount Invested |
|------|----------|------------|-----------------|
| 1981 | Cutaias | New America | $20,125 |
| 1981 | Koehlinger | Soul | 5,000 |
| 1981 | Pasternaks | Pop | 5,500 |
| 1982 | Pasternaks | Rock Kandy | 6,660 |

The co-tenants appointed petitioner Frank Pasternak as "co-tenancy operator" ("CTO") to manage the affairs of all four co-tenancies. He had the exclusive right and duty to conduct the affairs of each co-tenancy.

Pasternak, a CPA, knew little about the recorded music industry and had agreed to become co-tenancy operator at the request of Barbret and Labbadie, two of the promoters. He executed the leases, marketing agreements, and production and distribution contracts on behalf of the co-tenancies as he was instructed by the Phonomasters promoters without negotiating the terms of the agreements. He received none of the co-tenants' initial investments and kept no records of their interests.

The co-tenants' checks, payable to the various "leasing agents,"[1] were deposited in the agents' accounts. Pasternak executed releases permitting the leasing agents to take their commissions from the funds received by the co-tenancies. The agents then deducted their commissions and paid the balance to a trust account at the law firm of Patmon and Young. Otherwise Pasternak did not know what happened to the investors' funds after they went to the leasing agents. He did not know how much of the co-tenants' money, if any, was ultimately used to pay for rent or for marketing of the master recordings.

Although the operating agreement signed by each investor-co-tenant specified that the CTO was obligated to keep records of co-tenancy activities, there is no evidence that Pasternak ever maintained any books or records, not even of the amounts invested by each co-tenant. Although he signed the marketing agreements with Opportunity Marketing, Inc., he made no payments to any marketing agents as required by the lease or knew whether any payments had ever been made. Opportunity Marketing was not paid $132,000 to market the master recordings of each artist as required by each lease agreement. Pasternak did not insure the master recordings for $3,370,000 as required by the lease ($6,144,400 for Rock Kandy).

When Pasternak sent investors, who had co-tenancy interests in 1981 and 1982 programs, notices of their "aliquot share" of the investment tax credit and business deductions resulting from the lease transactions, Pasternak had no knowledge as to whether the investors' funds had been paid over for eligible deductible business expenses rather than for capital expenditures or other nondeductible expenditures. The Phonomasters limited partnerships had elected to pass through the investment tax credits which they received from the purchase of the master recordings to the co-tenancies.[2] The amount of investment tax credit allocated among the co-tenants, with regard to the 1981 Pop, Soul, and New America leases, was based on the assumption that each artists' master recordings had a fair market value of $3,370,000. With regard to the 1982 Rock Kandy lease, the Pasternaks (the only persons in this appeal who invested in Rock Kandy) claimed an investment tax credit based on the assumption that the Rock Kandy recordings had a fair market value of $6,144,000. Thus, the tax returns filed by the respective petitioners for 1981 and 1982 were based upon the assumption that the Phonomasters limited partnerships' cost bases for the master recordings were as follows:

| | Alleged Value | Purchase Price |
|---|---|---|
| 1981—Pop Phonomasters, Ltd. (Sterling Harrison—Artist) | $3,370,000 | $50,000 |
| 1981—Soul (L.V. Johnson—Artist) | 3,370,000 | 10,000 |
| 1981—New America Phonomasters, Ltd. (Monk Higgins—Artist) | 3,370,000 | 10,000 |
| 1982—Rock Kandy Phonomasters, Ltd. (Bonnie Pointer—Artist) | 6,144,000 | —— |

The Phonomasters limited partnerships had paid between $10,000 and $50,000 for the master recordings of each artist except for Bonnie Pointer, for whom all the master recordings that were to comprise an album never materialized.

On petitioners' tax returns, the amount of the business expense deductions equalled, for each taxpayer, exactly the amount invested by the taxpayer during the year in question. Pasternak testified that the information he provided to the cotenants with regard to their proportionate shares of investment tax credits and business deductions was given to him by the Phonomasters promoters. Petitioners claimed investment tax credits and business expense deductions, pursuant to Internal Revenue Code Section 162, in the following amounts:

1. The designated leasing agents were Barbret and Labbadie.

2. Under 26 U.S.C. § 48(d), as in effect in the 1981 tax year, a lessor of otherwise qualified property could elect to treat the lessee as having acquired the property for an amount equal to the fair market value of the property for purposes of the investment tax credit.

| Year | Taxpayer | Section 162 Deduction | Investment Tax Credit | Amount Invested |
|------|----------|----------------------|----------------------|-----------------|
| 1981 | Cutaias | $20,125 | $24,662 | $20,125 |
| 1981 | Koehlinger | 5,000 | 6,127 | 5,000 |
| 1981 | Pasternaks | 5,500 | 8,086 | 5,500 |
| 1982 | Pasternaks | 6,660 | 6,114 | 6,660 |

The Commissioner disallowed the claimed deductions and credits arising from petitioners' investments in the Phonomasters leasing programs on the grounds that the transactions had no economic substance and were entered into solely to obtain the expected tax benefits. Accordingly, the Commissioner determined that petitioners were liable for various deficiencies and additions to tax.

Petitioners filed petitions for redetermination of these deficiencies and penalties with the Tax Court. Their cases were consolidated for trial before the Tax Court with cases of other investors in the Phonomasters leasing programs.[3]

At trial, petitioners attempted to support the claimed values they used for investment tax credit purposes through the testimony of three purported experts, but the Tax Court rejected the arguments of these persons because they did not qualify as expert witnesses and their valuations had no basis for the estimate of the fair market value of the master recordings. The Tax Court accepted the testimony of the Commissioner's witness that the fair market value of each artists' master recordings ranged from $1,000–$20,000.

The Tax Court held that the Phonomasters leasing programs or co-tenancies lacked economic substance, and sustained the Commissioner's disallowance of deductions and investment tax credits and the assessment of tax penalties. With respect to the Rock Kandy master recordings, the Tax Court found that the Pasternaks failed to establish that any amount was paid for the recordings in 1982 or, indeed, that the recordings even existed in 1982. With respect to the 1981 master recordings, the Tax Court's determination was based, in part, on the vast discrepancy between the actual purchase prices ($10,000–$50,000)

and the alleged fair market values ($3,370,-000) on which the claimed investment tax credits were based.

Petitioners filed a timely appeal.

## II.

Petitioners first argue that the statutory notices of deficiency issued by the IRS were arbitrary and capricious, based upon illegal conduct by respondent, and inadequate to apprise them of the grounds for the adjustments to their tax. They contend that consequently the presumption of correctness was lost and the burden of going forward with the evidence shifted to respondent.

In the notices of deficiencies, respondent disallowed all deductions and credits related to petitioners' Phonomasters transactions. Respondent's determinations are presumed correct and petitioners bear the burden of proving them wrong. *Welch v. Helvering*, 290 U.S. 111, 54 S.Ct. 8, 78 L.Ed. 212 (1933); Rule 142(a). No particular form is required for a valid notice of deficiency, and respondent need not explain how the deficiencies were determined. *Campbell v. Commissioner*, 90 T.C. 110, 115, 1988 WL 3695 (1988). All that is required is that the notice advise petitioners that respondent has in fact determined a deficiency. *Foster v. Commissioner*, 80 T.C. 34, 229–30, 1983 WL 14913 (1983), *aff'd in part and vacated in part*, 756 F.2d 1430 (9th Cir.1985), *cert. denied*, 474 U.S. 1055, 106 S.Ct. 793, 88 L.Ed.2d 770 (1986). Thus, all a notice of deficiency need do is identify the taxpayer, show that a deficiency was determined, state the taxable year involved, and set forth the amount of the deficiency. *Commissioner v. Stewart*, 186 F.2d 239, 242 (6th Cir.1951); *Estate of Yaeger v. Commissioner*, 889 F.2d 29, 35 (2d Cir.1989), *cert. denied*, 495 U.S. 946, 110 S.Ct. 2205, 109 L.Ed.2d 531 (1990). In the present case, the notices of deficiency contained all of the required information. Furthermore, the notices explained in detail the bases for the deficien-

**3.** One of the investors has already appealed the decision of the Tax Court to this court in *Dona-*

*hue v. Commissioner*, 959 F.2d 234 (6th Cir. 1992).

cy determinations, even though the Commissioner was not required to include this information in the notices.

■ As for the contention of petitioners that respondent's conduct was illegal in obtaining books and records regarding the deficiencies, this court has already determined that the summonses served upon petitioner Frank Pasternak in connection with its investigation of the Phonomnasters tax shelters were valid. *United States v. Rosanova*, 816 F.2d 683 (6th Cir.1987). Moreover, this court does not look behind the notice of deficiency to determine or examine the evidence used, or the propriety of the Commissioner's motives in making the deficiency determinations. *Greenberg's Express, Inc. v. Commissioner*, 62 T.C. 324, 327, 1974 WL 2624 (1974). The Tax Court's determination that the notices of deficiency met all requirements is hereby affirmed.

### III.

We must next decide whether the Tax Court erred in determining that the leasing transactions lacked economic substance and a profit motive and correctly disallowed business expense deductions and tax credits based on these transactions.

■ To be valid, an asserted business expense deduction or tax credit on depreciable property that has a useful life of more than three years must satisfy both components of a two-part test. The threshold question is whether the transaction has economic substance. If the answer is yes, the question becomes whether the taxpayer was motivated by profit to participate in the transaction. *Rose v. Commissioner*, 868 F.2d 851, 853 (6th Cir.1989); *Mahoney v. Commissioner*, 808 F.2d 1219, 1220 (6th Cir.1987). If, however, the court determines that the transaction is a sham, the entire transaction is disallowed for federal tax purposes, and the second inquiry is never made. The proper test for whether "a transaction is a sham is whether the transaction has any practicable economic effects other than the creation of income tax losses." If the transaction lacks economic substance, then the deduction must be disallowed without regard to the niceties of the taxpayer's intent. The Tax Court's

findings of fact on this issue are reviewed under a clearly erroneous standard. *Id.; Roth Steel Tube Co. v. Commissioner*, 800 F.2d 625, 629 (6th Cir.1986), *cert. denied,* 481 U.S. 1014, 107 S.Ct. 1888, 95 L.Ed.2d 496 (1987).

In the present case, the Phonomasters tax shelter promoters purchased master recordings of three artists on December 28, 1981, paying $10,000 for the songs of L.V. Johnson and Monk Higgins and $50,000 for the songs of Sterling Harrison. The master recordings of each artist were then immediately valued at $3,370,000, a value which the Tax Court found to be vastly inflated. The promoters also valued Bonnie Pointer master recordings, which were to comprise an album, at $6,144,400. The promoters passed the investment tax credits based on these inflated values onto the investors. By claiming the investment tax credits as well as business expense deductions for the amounts they invested, petitioners saved at least $1.50 in taxes for every dollar invested, an investment return of 50 percent arising from tax savings alone. The Tax Court denied the claimed tax credits and deductions on the grounds that the transactions in question lacked economic substance and had no effect other than the creation of tax losses. We agree with the determination of the Tax Court for the following reasons.

### A. 1982 Rock Kandy Co–Tenancy

■ The Tax Court based its determination that the 1982 Rock Kandy transaction lacked economic substance in the absence of convincing evidence that master recordings sufficient to comprise an album of Bonnie Pointer songs actually existed on December 31, 1982. Bonnie Pointer was the recording artist whose master recordings Rock Kandy Phonomasters, Ltd. was supposed to have purchased and then leased to the Rock Kandy Leasing Co-tenancy. Although petitioners were repeatedly asked to produce the Bonnie Pointer master recordings, they were able to offer tapes of only five songs, and of these, only three were finished recordings.

Petitioners attempted to blame the IRS for their failure to produce all the recordings by introducing a letter purportedly showing that the Rock Kandy Co-tenancy gave them to the IRS, pursuant to a summons, in 1984. The Tax Court, however, refused to believe that the co-tenancy would have handed over its only copies of uninsured recordings purportedly worth over six million dollars. Furthermore, there was no evidence that the co-tenancy had insured the masters, even though by the terms of the operating agreement, the Rock Kandy Co-tenancy bore the risk of an alleged six million dollar loss. The Tax Court concluded that petitioners had failed to produce sufficient evidence of the existence of the Bonnie Pointer album.

The Tax Court was not clearly erroneous in determining that petitioners failed to present sufficient evidence concerning the Bonnie Pointer master recordings. The letter which petitioners refer to (see Supplement to Joint Appendix, p. 493) is not sufficient to establish the existence of the recordings. A letter from Rock Kandy to Bonnie Pointer dated February 11, 1983 indicates that as of that date she had not fulfilled her recording commitment for her first album (Exhibit cc). Without sufficient evidence of the Bonnie Pointer master recordings, the Rock Kandy offer, operating agreement, lease, marketing agreement, petitioners' appraisals, and the numerous other documents submitted in evidence were all "a mere paper chase." *James v. Commissioner*, 87 T.C. 905, 918, 1986 WL 22045 (1986), *aff'd*, 899 F.2d 905 (10th Cir. 1990). Accordingly, all claimed expenses and tax credits arising from the 1982 Rock Kandy transactions were properly disallowed.[4]

B. 1981 Soul, Pop, New America Co–Tenancies

The Tax Court determined with regard to the 1981 recordings leased by the Soul, Pop and New America Co-tenancies that the

gross disparity between the values claimed for investment tax credit purposes and the fair market value as determined by the IRS's expert witness demonstrated a lack of economic substance.

The Tax Court found that during the last week of December 1981, the Soul, Pop, and New America Phonomasters limited partnerships had acquired the master recordings for the 1981 leasing programs for between $10,000 and $50,000 for each artist, with promises to pay additional amounts not exceeding $50,000 upon delivery of the masters by December 31, 1981. However, there was no evidence that the December 31 payments were ever made. The Phonomasters limited partnerships had no obligations to pay anything further except royalties on actual sales of derivatives from the masters, which never occurred.

Despite the relatively modest cost of acquiring the master recordings, petitioners claim that on December 31, 1981, the master recordings for each artist had a fair market value of $3,370,000. They submitted into evidence a variety of documents which they claimed were appraisals of these assets, and they called as witnesses the authors of the purported appraisals. None of the appraisals complied with the requirements for expert witness reports of Rule 143(f) of the Tax Court's rules, and petitioners' counsel did not move to qualify any of their witnesses as experts.

The Commissioner's valuation witness, whose testimony the Tax Court found convincing, had the following qualifications. Thomas Bonetti had been employed in the recorded music industry for 30 years and owned two corporations, Celebrity Licensing, Inc., and Janus Records, Inc., that dealt in the licensing, leasing, sale and purchase of master recordings. At the time of trial, Bonetti had prepared approximately 600 formal written appraisals to determine the potential stream of income from master recordings purchased, sold, leased, or li-

---

**4.** Petitioners argue that the record does not support the factual findings upon which the Tax Court based its decision. The Tax Court, however, simply found that much of the evidence submitted by petitioners was not credible. Petitioners failed to include in the joint appendix most of the documents, which they argue support the existence of the Bonnie Pointer album as of December 31, 1982, and failed to correct this deficiency when requested to do so by this court in violation of Rule 30(a)(4), Federal Rules of Appellate Procedure.

censed by his clients. Of these, between 30 and 60 dealt with masters which, like the master recordings at issue in the present case, fit into the jazz or so-called black music segment of the market. Bonetti noted that most masters of new, previously unreleased artists were appraised at less than $100,000, and that in the recorded music industry, over 90 percent of recordings do not recover their cost.

Bonetti testified that although Sterling Harrison, the artist on the Pop master recordings, had considerable potential, he believed that the production quality on the recordings was below industry standards. He believed that with reasonably good airplay, an album produced from the recordings might sell 20,000 units and have a useful life of up to five years. Using a potential stream of income valuation method, Bonetti set the December 1981 fair market value of the Sterling Harrison recordings at $20,000.

Bonetti believed that the production quality of the 1981 recordings of L.V. Johnson and Monk Higgins was unexceptional or marginal to weak. He saw little likelihood that either artists' recordings would receive significant airplay and opined that each album might sell 3,000 units over a three-year useful life. He concluded that each had a fair market value of $1,500.

The Tax Court concluded that Bonetti's credentials were excellent, the substance of his testimony was credible, and his manner in testifying was convincing. This court must give great deference to the Tax Court's determination pertaining to the credibility of witnesses. *Anderson v. City of Bessemer City*, 470 U.S. 564, 575, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985). *See also, Rabidue v. Osceola Refining Co.*, 805 F.2d 611, 616 (6th Cir.1986), *cert. denied*, 481 U.S. 1041, 107 S.Ct. 1983, 95 L.Ed.2d 823 (1987). There is nothing to indicate that Mr. Bonetti's valuations are clearly erroneous. The Tax Court's conclusion that the claimed values for the master recordings vastly exceeded their fair market value is affirmed.

This conclusion indicates that the promoters used the grossly inflated values of the master recordings for the sole purpose of increasing the tax benefits of the leasing programs, which is what they were actually selling to the co-tenants, and that the 1981 transactions lacked economic substance, because they had no practical economic effect other than the creation of tax losses. Reliance on an inflated value may be "the most important single factor suggesting that the actual motive for the ... activities was tax avoidance rather than even speculative profit." *Independent Electric Supply, Inc. v. Commissioner*, 781 F.2d 724, 728 (9th Cir.1986). *See also, Hunt v. Commissioner*, 938 F.2d 466, 472 (4th Cir.1991) ("disparity between the prices of the master recordings and their actual fair market values" was a factor in determining that transactions were shams).

In addition, the Tax Court based its finding that the 1981 leasing transactions lacked economic substance on evidence of the manner in which the co-tenancies carried on their activities. The Tax Court first correctly determined that a consideration of subjective business purpose must be made at the co-tenancy level. For tax purposes, the co-tenancies were partnerships as defined by the Internal Revenue Code, which states that a partnership is any "syndicate, group, pool, joint venture or other unincorporated organization through or by means of which any business, financial operation, or venture is carried on, and which is not ... a corporation or a trust or estate." 26 U.S.C. §§ 761(a), 7701(a)(2). The co-tenancies are partnerships within the plain meaning of the statutory definition. It is well-settled that if a taxpayer engages in a purported trade or business through a partnership, profit motive is to be determined at the partnership level. *Brannen v. Commissioner*, 722 F.2d 695, 703 (11th Cir.1984). *See also, Polakof v. Commissioner*, 820 F.2d 321, 323 (9th Cir.1987), *cert. denied*, 484 U.S. 1025, 108 S.Ct. 748, 98 L.Ed.2d 761 (1988); *Simon v. Commissioner*, 830 F.2d 499, 507 (3rd Cir.1987); *Tallal v. Commissioner*, 778 F.2d 275, 276 (5th Cir.1985). Thus, any subjective examination of profit motive must be made at the co-tenancy level, and petitioners' argument

that the Tax Court erred because no determination of profit motive was made at the Phonomasters limited partnership level is without merit.

■ When taxpayers conduct their business through a partnership, profit motive is to be determined at the partnership level by focusing on the actions of those persons selected to manage the affairs of the partnership. *Simon v. Commissioner,* 830 F.2d at 507; *Marine v. Commissioner,* 92 T.C. 958, 988–89, 1989 WL 47992 (1989), *aff'd,* 921 F.2d 280 (9th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 77, 116 L.Ed.2d 50 (1991); *Fox v. Commissioner,* 80 T.C. 972, 1007–08 (1983), *aff'd* 731 F.2d 230 (4th Cir.1984); *Flowers v. Commissioner,* 80 T.C. 914, 932 (1983). In the present case, the co-tenancies selected petitioner Frank Pasternak, the "co-tenancy operator," to manage their affairs, and the individual co-tenants thereafter sat back and did nothing.

The record supports the Tax Court's determination that the assignment of duties to Pasternak was "mere window dressing for transactions structured for tax avoidance." Frank Pasternak did virtually nothing as co-tenancy operator except blindly sign "form" lease and marketing agreements and notify the co-tenants of the tax deductions and credits they should claim. Although he signed lease agreements obligating each co-tenancy to pay a minimum of $275,000 ($435,000 for the 1982 Rock Kandy Co-tenancy), Pasternak did not attempt to negotiate any of the terms of the agreements. It is evident that the terms of the agreements were not to be enforced. For example, no insurance was ever purchased, as required, on each artists' master recordings, which were purportedly worth over three million dollars. Opportunity Marketing, which was to promote the recordings, was not paid $132,000 for promotion of each artists' master recordings as required by each lease agreement. Also there is no evidence that Pasternak kept copies of the documents he had signed, nor did he keep books and records as specified in the operating agreements. He did not even keep a record of the amounts which each co-tenant invested. He did not inquire into the application of co-tenancy funds, did not open a bank account for each of the co-tenancies as required by the operating agreements, and did not handle any of the co-tenants' money. He did not supervise in any manner the agents hired to carry out the production and marketing of products from the master recordings beyond making a few casual inquiries as to whether any records had been produced. He carried out no promotion or sales plans. He did not know how much of the co-tenants' money, if any, was ultimately used to pay for rent, for manufacturing, or for marketing. In passive operations such as the Phonomasters co-tenancies, the care exercised in overseeing the performance of duties assigned to third parties is of particular importance. *Flowers v. Commissioner,* 80 T.C. at 932. We agree with the Tax Court's determination that Pasternak's inattentiveness, lack of records, and failure to carry out the terms of the lease agreements is consistent with the tax-motivated nature of the transactions.

■ Finally, there is evidence that the 1981 transactions were marketed as tax shelters whose promised tax-savings guaranteed economic gain to the participants, even if the co-tenancies failed to sell a single reproduction of their recordings. No sale was ever generated from the master recordings at issue. Nevertheless, as a result of the deductions and tax credits petitioners claimed, and offset against income from other sources, petitioners obtained at least a 50 percent return on their investments through tax savings alone. This is similar to the tax shelter described by the Fourth Circuit in *Barnard v. Commissioner,* 731 F.2d 230 (4th Cir.1984) in which the cash contributed was less than 25% of the total "purchase price," and each taxpayer picked up a "deduction" three times as great as his actual contribution in cash. The *Barnard* court disallowed the tax credit, concluding:

> Accordingly, the direct tax benefit, even if the book were a total bust, selling not so much as a single copy, was an amount two times greater than the only economic asset, the cash, actually put up. It was a

paradigmatic case of how to win by losing. Putting up cash of $9,000, a taxpayer generated a "deduction" of approximately $36,000. The tax savings, accordingly, amounted to $18,000, bringing the taxpayer out way ahead, no matter what. *Id.* at 231. In the present case, the Tax Court made a similar conclusion, stating:

The record as a whole plainly shows that the Phonomasters transactions here in question were designed as tax deduction schemes in the guise of phonograph record promotion arrangements. The lessor partnerships for 1981 acquired the master recordings for purchase prices of $10,000 to $50,000 plus promises of additional payments in the nature of royalties to be paid out of receipts from exploitation of the master recordings. There is no evidence that any such additional payments were made. Petitioners failed to establish any amount as paid for the Rock Kandy master in 1982 and also failed to prove that there even was a Rock Kandy master or an agreement for its sale. The amounts actually paid for the 1981 masters were vastly in excess of the value of the masters as established by expert testimony.... Nevertheless, petitioners claimed investment tax credits based on the immensely inflated supposed basis of $3,370,000 for each of the 1981 masters—even though actual cost was only $10,000 to $50,000 and no royalties ever were paid. In addition petitioners claimed expense deductions for the full amounts of co-tenancy expenditures, without a showing of the deductibility of such payments. The tax benefits claimed immediately were half again as much as the so-called investment and no revenue ever was produced.... The 1981 Phonomasters transactions were devoid of economic substance consonant with their intended tax effects.

We believe these findings are not clearly erroneous and the Tax Court correctly determined that the 1981 transactions were shams, lacking in economic substance or profit motive. The deductions and tax credits based on these transactions were properly disallowed.

## IV.

■ Petitioners also contend that the Tax Court erred in assessing penalties against them under 26 U.S.C. § 6653(a)(1) and (2).[5] Section 6653(a)(1) of the Internal Revenue Code imposes a penalty of five percent of a tax underpayment if any part of that underpayment is due to negligence or intentional disregard of the rules and regulations. Section 6653(a)(2) imposes an additional penalty of 50 percent of the interest payable on the portion of the underpayment attributable to negligence or intentional disregard of the rules and regulations. Negligence is defined as "lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances." *Leuhsler v. Commissioner*, 963 F.2d 907, 910 (6th Cir. 1992); *Marcello v. Commissioner*, 380 F.2d 499, 506 (5th Cir.1967), *cert. denied*, 389 U.S. 1044, 88 S.Ct. 787, 19 L.Ed.2d 835 (1968); *Neely v. Commissioner*, 85 T.C. 934, 947, 1985 WL 15422 (1985). The taxpayer has the burden of proof on the negligence issue. *Skeen v. Commissioner*, 864 F.2d 93, 96 (9th Cir.1989).

■ We review the factual findings of the Tax Court in this regard under the clearly erroneous standard. *Leuhsler*, 963 F.2d at 910. The finding that the taxpayer failed to meet the burden of proving due care is a finding of fact. *Skeen*, 864 F.2d at 96.

In the present case, the Tax Court found that petitioners were aware that they were buying a program that consisted primarily of "window dressings" for tax benefits and either negligently or intentionally disregarded the law. The Tax Court noted that section 6653, which prohibits deductions and credits for activity not conducted with the objective of making an economic profit, is a well established law and not beyond

---

**5.** The particular version of this code section applicable to petitioners' case has since been amended. All statutory references in this opinion are to the Internal Revenue Code of 1954, as amended and in effect during 1981.

the comprehension of the layman. The Tax Court rejected petitioners' claims that they expected to make a profit from their investments due to the involvement of some well established members of the record industry because of their complete indifference to the risks involved. *See Leuhsler*, 963 F.2d at 911. Petitioners invested in artists they had never heard of, without listening to the master recordings prior to investing, and without even inquiring whether a reliable independent evaluation of the profit potential had ever been made. None of the petitioners indicated that they had asked for any written projections on sales, costs, and profit margins before tendering their money; none requested copies of the operating agreement, lease, or marketing plan; and none bothered to determine what remedies might be available if the promoters failed to perform as promised.

Although petitioners Mr. and Mrs. Cutaia and Koehlinger stated that the amounts they had invested in the leasing programs were "substantial," by their own admission, they turned their money over to the leasing agents and paid virtually no further attention to their investments. Instead, they entrusted the supervision of the co-tenancies to Pasternak, who was an accountant with no expertise in the production and distribution of recorded music.

The Tax Court found that even the investors in the lower tax brackets claimed tax reductions of $1.50 for every dollar invested and that a reasonably prudent person would have asked a tax advisor if this windfall were not "too good to be true." *McCrary v. Commissioner*, 92 T.C. 827, 850, 1989 WL 35568 (1989); *See also Brown v. Commissioner*, 43 T.C.M. (CCH) 1322, 1324, 1982 WL 10532 (1982) ("To anyone ... not incorrigibly addicted to the 'free lunch' philosophy of life, the entire scheme had to have been seen as a wholly transparent sham").

Although petitioners argue that they relied on the advice of "financial advisors, industry experts, and professionals," the purported experts were either the promoters themselves or agents of the promoters. Advice of such persons can hardly be described as that of "independent professionals." *See Leuhsler*, 963 F.2d at 910 (unsophisticated investors cannot escape negligence penalty by relying on the advise of persons who are not professional investment counselors); *Ryback·v. Commissioner*, 91 T.C. 524, 565, 1988 WL 92157 (1988) (negligence penalty sustained where taxpayers relied only upon advice of persons who were not independent of promoters). *Skeen*, 864 F.2d at 96 (reliance on professional advice must be reasonable under the circumstances).

For these reasons, the Tax Court correctly sustained the imposition of the negligence penalty under sections 6653(a)(1) and (2) of the Internal Revenue Code.

## V.

Petitioners also contend that the Tax Court erred in sustaining the addition to tax under section 6659 for an underpayment attributable to a valuation overstatement, i.e., an overvaluation of the co-tenancies assets, the master recordings. A valuation overstatement is a valuation exceeding the true value by 150 percent or more. 26 U.S.C. § 6659(c). *See Leuhsler*, 963 F.2d at 911. Congress's intent in enacting the section 6659 valuation overstatement penalty was to discourage taxpayers from investing in abusive tax shelters, which relied on the significant overvaluation of shelter assets in order to produce the desired losses that served to reduce the investors' tax liabilities. *See* H.R.Rep. No. 201, 97th Cong., 1st Sess. at 243 (1981–2 C.B. 352, 398).

Petitioners first challenge the Tax Court's finding that there was a valuation overstatement. As previously discussed, this argument is to no avail. Taxpayers claimed the investment tax credits based on the assumption that the 1981 master recordings for each artist had a fair market value of $3,370,000. The Tax Court, however, determined that the master recordings had fair market values of only $20,000 (Sterling Harrison) or $1,500 (L.V. Johnson and Monk Higgins). As discussed above, this determination is not clearly erroneous. Moreover, the Tax Court determined that the 1982 Rock Kandy master recordings of Bonnie Pointer sufficient to comprise an

album, for which the Pasternaks claimed an investment tax credit based on a claimed value of $6,144,000, were not sufficiently shown to have existed as of December 31, 1982. Therefore, it is clear that in claiming entitlement to the investment tax credits, petitioners overstated the value of the master recordings by more than 150 percent.

Petitioners also argue that as a matter of law, section 6659 does not apply to underpayments of tax attributable to advance rental deductions. However, contrary to petitioners' contention, the Commissioner did not assert the overvaluation penalty with respect to that portion of the underpayment attributable to the claimed business expense deductions. For example, the notice of deficiency issued to taxpayer Anthony Cutaia shows that the total underpayment of tax for 1981 was $15,324, but that the underpayment of tax attributable to the valuation overstatement was only $7,448. This is equal to the amount of investment tax credit Cutaia claimed with respect to his interest in the master recordings. The notice shows that the section 6659 penalty was imposed only with respect to this amount because it was only this amount which resulted in an underpayment of tax attributable to a valuation overstatement. Likewise, the notices of deficiency with respect to each of the other petitioners shows that the overvaluation penalty was imposed only with respect to that portion of the underpayment attributable to the claimed investment tax credits. For these reasons, there is no merit to petitioners' argument that the overvaluation penalty was improperly imposed with regard to their claimed rental deductions.

The Second Circuit in *Gilman v. Commissioner*, 933 F.2d 143, 151 (2nd Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 871, 116 L.Ed.2d 776 (1992) held that when deductions are disallowed because of the transaction's lack of economic substance, if the lack of substance is due in part to an overvaluation of property, for which improper depreciation deductions or investment tax credits are taken, then the deficiency in tax is attributable to an overstatement of value and subject to the penalty under section 6659. *See also Massengill v.*

*Commissioner,* 876 F.2d 616, 619–20 (8th Cir.1989). We agree with this reasoning.

Petitioners err in their contention that the penalty was assessed on the advance rental business expense deductions. It was assessed on the improper tax credits, which were the result of an overvaluation of the value of the master recordings. In the present case, the lack of economic substance was due in part to this overvaluation, and the penalty under section 6659 was properly imposed.

**VI.**

We must finally determine whether the Tax Court erred in determining that petitioners are liable for the increased rate of interest on a tax-motivated transaction under code section 6621(c).

In an effort to discourage the proliferation of abusive tax shelters, Congress amended Section 6621 of the Code in 1984 to provide for an increased rate of interest for substantial underpayments of tax attributable to "tax motivated transactions." Tax Reform Act of 1984, Pub.L. No. 98–369, 98 Stat. 494, § 144. As amended, Section 6621(c)(1) of the Internal Revenue Code of 1986 imposes an interest rate of 120 percent of the statutory rate for substantial tax underpayment "attributable to tax motivated transactions." The term "tax motivated transaction" encompasses "any sham or fraudulent transaction." 26 U.S.C. § 6621(c)(3)(A)(v). A tax motivated transaction also means "any valuation overstatement (within the meaning of section 6659(c))." Section 6621(c)(3)(A)(i).

Because the Tax Court correctly determined that petitioners' motives for investing in the leasing transactions were to reduce their tax liability rather than to reap a profit, the section 6621(c) penalty must also be sustained. The mandatory language of section 6621(c) does not give the Commissioner discretion to waive this penalty. *See Kennedy v. Commissioner*, 876 F.2d 1251, 1256 (6th Cir.1989). Therefore, the penalty was properly imposed.

To conclude, the decision of the Tax Court is hereby AFFIRMED.