T.C. Memo. 1996-261


UNITED STATES TAX COURT


DERWYN J. BOOKER, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 15366-88.                    Filed June 6, 1996.


Derwyn J. Booker, pro se.

Lavonne D. Lawson, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

WRIGHT, Judge: For taxable year 1984, respondent determined a deficiency in petitioner's Federal income tax in the amount of $4,737 and additions to tax under section 6653(a)(1) in the amount of $236.85, under section 6653(a)(2) for 50 percent of the

interest due on $4,737, and under section 6659 in the amount of $459.30, and for increased interest under section 6621(c).

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the year at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.  The issues for decision for the taxable year 1984 are as follows:

(1)  Whether petitioner is entitled to claimed deductions and a claimed investment tax credit in connection with a master recording lease transaction.  We hold that he is not.

(2)  Whether petitioner is entitled to a claimed business bad debt deduction in the amount of $76,056 in connection with his investment in the Carter Co.  We hold that he is not.

(3)  Whether unemployment compensation petitioner received in the amount of $5,312 is taxable as determined by respondent. We hold that it is.

(4)  Whether petitioner is subject to self-employment tax on his self-employment income.  We hold that he is.

(5)  Whether petitioner is liable for an addition to tax for negligence under section 6653(a)(1) as determined by respondent. We hold that he is.

(6)  Whether petitioner is liable for an addition to tax for a valuation overstatement under section 6659 as determined by respondent.  We hold that he is.

(7) Whether petitioner is liable for increased interest under section 6621(c). We hold that he is.

(8) Whether petitioner is liable for a penalty for maintaining a frivolous action under section 6673. We hold that he is not.

FINDINGS OF FACT

The stipulation of facts and the attached exhibits are incorporated herein. Petitioner resided in Toledo, Ohio, at the time the petition was filed.

Petitioner has a bachelor of science degree in mechanical engineering and was employed as an engineer for the Tosco Corp. in its oil refinery at Bakersfield, California. Petitioner received unemployment compensation in the amount of $5,312 in 1984. In 1984, after leaving Tosco, petitioner started a business named J. Booker and Co., offering financial advice.

Encore Leasing

During 1983, petitioner investigated a number of tax shelters before deciding to participate in the Encore Leasing Tax Shelter Program as both an investor and a promoter. Petitioner was the managing partner of BBG, Ltd.(BBG), which was composed of petitioner and two other individuals. On December 27, 1984, petitioner, acting on behalf of BBG, entered into a lease transaction with Encore Leasing Corp. (Encore); the lease indicates that BBG's total investment in the program was $14,880.

It is unclear from the record the exact amount of petitioner's share of the initial investment in Encore.

Encore was incorporated on February 1, 1982. Encore is in the business of leasing master recordings of previously released pop and gospel albums. Master recordings are original recordings of performances on audio tape used to produce disc records and tapes for mass distribution. In 1984, Encore leased master recordings for gospel records, educational computer programs, and home computer games.

Clint Collings (Collings) was the president and sole shareholder of Encore during the year at issue. Encore's prospectus for 1984 consists of 24 pages, of which 14 pages are cover sheets, table of contents, blank sample forms, and blank pages. Encore's promotional material for 1984 also includes a 51-page "Tax Opinion" and an 8-page addendum addressing 1984 tax changes both prepared by Attorney Henry D. Nunez (Nunez).

Although page 1 of the prospectus refers to an "exciting business opportunity while taking advantage of current tax laws", it mentions very little about said opportunity, while strongly emphasizing the benefits derived from the investment tax credit. The prospectus contains a letter from Mr. Nunez stating:

> upon request by Encore, we will assist a lessee and their counsel and accountants if the Internal Revenue Service challenges the tax structure of the transaction as set forth in the Opinion and the lessee is unable to reach a satisfactory resolution at the initial audit level. Such assistance would include advice in connection with their appearances before the appellate division of the Internal Revenue Service. We would

also be available to assist the lessee's counsel in defense before the U.S. District Court, U.S. Tax Court or the U.S. Court of Claims.

Encore's prospectus contains in substance only one page, discussing in general terms the gospel record market, the home computer game market, and educational computer programs. The prospectus does not specifically address the master recordings, the computer games, or the computer programs that Encore intends to lease, the quality of such, nor any other facets of the Encore program.

The "How Our Program Works" section of the prospectus is one page in length containing four paragraphs. Three paragraphs are devoted to the tax aspects of the program, and one paragraph refers to the lease agreement. The remainder of the page outlines in tables the amount of advance payment required from the lessee and the amount of investment tax credit passed through to the lessee. The "Financial Section" of the prospectus contains two paragraphs and explains the investment tax credit available with respect to the sound recordings and computer software. There is no analysis in the prospectus of the potential nontax, economic profitability of its leasing program. Also, there is no information in the prospectus regarding the marketability of the master recordings that Encore intends to lease, nor any information concerning how master recordings can be marketed. Petitioner had a copy of the Encore prospectus, the

tax opinion, and the lease agreement when making his investment in Encore.

The Encore lease agreement contains a 7-year lease term and provides that petitioner did not have an option to purchase the master recording or to renew the lease agreement at the end of the lease term. Encore uses a standard master recording lease agreement which it included in all its promotional materials. Petitioner did not modify any of the terms of the lease agreement which he signed. From Encore's product catalogue, petitioner chose the master recording "Unity" by the Kingcannon family. Before signing the lease agreement, petitioner did not listen to the master recording, was not acquainted with the artists who recorded the master, and had not previously listened to any of the artists' recordings. At no time did petitioner obtain an independent written appraisal of the subject master recording, nor did he obtain an independent written opinion with respect to the profitability of entering into the Encore lease agreement. Encore did provide petitioner with a 1-1/2-page written appraisal dated June 24, 1985. The appraisal lists the subject master's value at $500,000.

Encore purchased the subject master from the Kingcannon family through the artists' agent, Gabriel Records. The purchase price for the subject master was $496,000. Encore issued a check to Gabriel Records on December 31, 1984, in the amount of $5,208 and executed a promissory note for the balance of $490,792. The

actual value of the subject master equaled between $3,000 and $5,000.

Included in Encore's prospectus package is a list of distributors with respect to the distribution of sound recordings made from the subject master recording. Petitioner entered into a standard distribution-employment agreement with Arrival Records and did not modify any of the terms of the agreement before signing. Petitioner's distribution agreement with Arrival was subsequently assigned to Marock Records.

During the term of the lease between petitioner and Encore, total income derived from sales of albums and cassettes made from the Kingcannon master totaled $570.85. Petitioner's share of the income from sales of albums and cassettes made from the subject master totaled $18.57. The primary purchaser of the sound recordings made from the master was the artists, the Kingcannon family. During the term of the lease, petitioner did not personally distribute sound recordings made from the subject master.

During 1984, petitioner worked as an agent for Encore selling its tax shelters at a commission rate of 20 percent of receipts from the sales of leases. During the latter part of 1984, petitioner issued three newsletters directed to his master recording lease clients. Each newsletter was entitled DERWYN J. BOOKER, TAX ADVANTAGED INVESTMENT COUNSELING.

Petitioner received commissions from Encore in the amount of $11,010 in 1984, and in the amount of $2,976 in 1985, with respect to his 1984 master lease sales. Petitioner claimed deductions in the amount of $9,164 and an investment tax credit in the amount of $17,808 with respect to his participation in the Encore program during 1984.

On September 12, 1986, the U.S. District Court for the Eastern District of California permanently enjoined Mr. Collings, as shareholder and president of Encore, from taking any action in furtherance of the organization, promotion, advertising, marketing, selling or offering for sale, any new or future interest in the Encore master recording lease programs.

The Carter Company

Petitioner entered into an investment agreement with the Carter Co. (Carter) on January 4, 1983. Carter held itself out to potential investors as a company engaged in the medical factoring business, purchasing medical accounts receivable and insurance claims from doctors at a discounted rate. Petitioner did advance funds to Carter under the investment agreement. Petitioner claims to have contributed a total of $76,050, however; the record is not clear as to the precise amount of petitioner's investment. No security or collateral was given for petitioner's advances to Carter. Carter issued promissory notes to petitioner in exchange for his contribution. Carter made quarterly payments to its investors at a rate of 7 to 10 percent

on their investment.  Carter investors had the option of taking their quarterly payments or electing to have the funds rolled over into another promissory note.  Petitioner involved several of his investment clients, including friends and relatives, in Carter.  Petitioner and his clients regularly elected to reinvest their quarterly interest payments.  Carter made no payments on any of the notes at issue.

An investigation, conducted by the Securities and Exchange Commission in 1983, revealed that Carter did not represent any doctors, had no medical accounts receivable, and was not engaged in the medical factoring business.  Carter filed a petition in bankruptcy in the U.S. Bankruptcy Court for the Central District of California under chapter 11 of the Bankruptcy Code on December 8, 1983.  In 1990, the proceeding was converted to a chapter 7 bankruptcy proceeding.  In 1992, petitioner received a payment representing some percentage of his total investment in Carter as a result of the bankruptcy proceeding.

Petitioner claimed a deduction on Schedule C of his 1984 income tax return in the amount of $76,056 for "bad notes" with respect to his dealings with Carter.  Respondent disallowed the claimed deduction on the basis that it was not a bona fide debt within the meaning of section 166.

OPINION

Issue 1.  Encore

Section 162 allows a deduction for ordinary and necessary expenses paid or incurred during the taxable year in carrying on a trade or business.  In order to establish entitlement to deductions and credits, taxpayers have the burden of proving that they meet the statutory requisites.  New Colonial Ice Co. v. Commissioner, 292 U.S. 435 (1934).

Section 38 allows a credit for investment in certain depreciable property.  The amount of the credit is limited to a percentage of a taxpayer's qualified investment in section 38 property.  Sec. 46(a).  Qualified investment in new property is a percentage of the property's basis, generally its cost.  Secs. 46(c)(1), 1012.  The lessor of the property, here Encore, may elect to pass through the credit to the lessee, here petitioner, and the lessee generally is treated as having acquired the property for its fair market value.  Sec. 48(d).

In Mahoney v. Commissioner, 808 F.2d 1219 (6th Cir. 1987), affg. 85 T.C. 127 (1985), the Court of Appeals for the Sixth Circuit, where an appeal of the instant case would lie, determined that in order to be valid, a transaction giving rise to asserted deductions must satisfy both components of a two-prong test.  See also Pasternak v. Commissioner, 990 F.2d 893 (6th Cir. 1993), affg. Donahue v. Commissioner, T.C. Memo. 1991-181; Rose v. Commissioner, 868 F.2d 851 (6th Cir. 1989), affg. 88

T.C. 386 (1987).  First, the transaction must have economic substance; the transaction cannot be a complete sham.  Mahoney v. Commissioner, supra at 1219.  Second, if the transaction is found to have economic substance, the question becomes whether the taxpayer was motivated by profit to participate in the transaction within the meaning of section 183.  Id.  If the transaction is found to be a sham, then the entire transaction is disregarded for Federal income tax purposes, and such niceties as whether the transaction was engaged in primarily for profit are simply not involved.  Id.  Therefore, in determining whether a particular transaction was a sham, a court should not address whether, in the light of hindsight, the taxpayer made a wise investment; instead, the court must address whether the taxpayer made a bona fide investment at all or whether the taxpayer merely purchased tax deductions.  Bryant v. Commissioner, 928 F.2d 745, 749 (6th Cir. 1991), affg. in part and revg. in part T.C. Memo. 1989-527.

The same two-part test is applied in determining whether a deduction or credit with respect to investment in a tax shelter is valid.  Illes v. Commissioner, 982 F.2d 163 (6th Cir. 1992), affg. T.C. Memo. 1991-449.  A tax shelter can be reasonably defined as a transaction entered into for the purpose of generating (1) deductions in excess of investment contributions claimed in a given taxable year to reduce income from other sources that year, and/or (2) credits in excess of the tax

attributable to the income from the investment claimed in a given taxable year to offset taxes on income from other sources that year.

In the tax shelter line of cases, the Court of Appeals for the Sixth Circuit has held that a transaction is a sham if it has no practicable economic effects other than the creation of income tax losses.  Pasternak v. Commissioner, supra; Illes v. Commissioner, supra.  The first prong of the Mahoney test requires an examination of the transaction, not the taxpayer. Illes v. Commissioner, supra at 165.  A taxpayer's alleged reasonable belief that his or her investment in a tax shelter had economic substance does not preclude treatment of the transaction as a sham.  Id.

Thus, our first inquiry is whether the master recording lease transaction entered into between Encore and petitioner had economic substance or whether it was a sham.  Several factors have been used to determine whether a transaction has economic substance.  One such factor is evidence that the transaction was marketed as a tax shelter generating little revenue.  See Pasternak v. Commissioner, supra at 901.  Encore's 24-page prospectus focuses primarily on the tax advantages of investing in the Encore program and contains only a brief description of the recording industry.  The prospectus does not describe the specific master recordings Encore intended to lease, or the nontax, economic profitability of Encore's leasing program.  The

obvious focus of the promotional materials distributed to petitioner was on the attendant tax benefits of the lease program. The tax opinion petitioner received with the promotional materials was twice as long as the prospectus itself and specifically raised the likelihood of prospective Internal Revenue Service (IRS) challenge and possible litigation in the Tax Court. Furthermore, very little revenue was generated from sales of sound recordings made from the subject master. Indeed, petitioner's share of the income from sales of albums and cassettes made from the subject master in 1984 totaled only $18.57. Nonetheless, petitioner claimed nearly $27,000 in deductions and investment tax credits in 1984 relating to the master lease transaction.

Reliance on an inflated value of the master recording is another factor considered in determining whether the underlying transaction has economic substance. Independent Elec. Supply, Inc. v. Commissioner, 781 F.2d 724, 728 (9th Cir. 1986), affg. T.C. Memo. 1984-472, cited with approval in Pasternak v. Commissioner, supra at 900. Disparity between the prices of the master recordings and their actual fair market values is yet another factor in determining whether transactions are shams. Hunt v. Commissioner, 938 F.2d 466, 472 (4th Cir. 1991), cited with approval in Pasternak v. Commissioner, supra at 900.

Encore valued the subject master leased by petitioner at $496,000 and subsequently provided petitioner with a 1-1/2-page

appraisal listing the master's value at $500,000. Mr. Tirk, respondent's expert witness, has been in the record business for 36 years in various positions including manufacturer, distributor, wholesaler, retailer, and executive vice president and owner of his own record company. Mr. Tirk's valuation is based upon many factors including the slight market for the particular music involved, the limited number of retail outlets that carry that type of music, the improbability of generating any sales from exploitation of the product, petitioner's complete lack of experience in the industry, the relative obscurity of the artists involved, and the poor quality of the master. Mr. Tirk valued the subject master at $3,000 to $5,000.

The manner in which the lessee carried on his or her activities can also be evidence of a lack of economic substance. Pasternak v. Commissioner, supra at 900-901. Petitioner blindly signed the form lease, failing to negotiate any of the lease terms, and purchased no insurance on the master although the master was purportedly worth $496,000. Petitioner did not obtain an independent appraisal with respect to either the value of the subject master or the possibility of making a profit with the master. Furthermore, petitioner neither listened to the master nor determined the quality of the master before signing the lease agreement.

Assuming that petitioner had a one-third interest in BBG, his share of the initial contribution amount advanced to Encore

in 1984 under the lease equaled $4,960, although he claimed deductions and investment tax credits in an amount exceeding $27,000.  The tax benefits petitioner claimed immediately were several times as much as the so-called investment, and little revenue was ever produced.

The illusory nature of the financing of the lease transaction is another factor suggesting lack of economic substance.  Rose v. Commissioner, 88 T.C. at 422.  Consistent with the tax-motivated nature of the subject transaction is the structure of the financing of the Encore lease with large commercially unreasonable deferred indebtedness which was very unlikely to ever be paid.  The debt was unlikely to ever be paid because little or no revenues were likely to be received.  All future lease payments were to come from a share of the profits earned on the sale of the recordings deferring the bulk of the consideration by promissory notes, nonrecourse in form and substance.

Based upon the foregoing, the record in the instant case convinces us that the lease transaction entered into between petitioner and Encore is devoid of economic substance.  It is apparent from the nature of the lease transaction that the Encore lease package was marketed and sold to petitioner as a tax shelter.  As we have determined that the subject lease transaction is devoid of economic substance, we need not address the issue of profit motive.  Accordingly, the lease transaction

does not give rise to any deductions or investment tax credits. Respondent is sustained on this issue.

Issue 2.  Carter

Section 166(a) allows a deduction for any debt which becomes worthless within the taxable year.  The deduction is allowable only in respect of a bad debt owed to the taxpayer.  Sec. 1.166-1(a), Income Tax Regs.  A bona fide debt is a debt arising from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money.  Sec. 1.166-1(c), Income Tax Regs.  Petitioner bears the burden of proving, first, that a bona fide debt existed, and second, that it became worthless in 1984.  Rule 142(a); Crown v. Commissioner, 77 T.C. 582 (1981).

In determining whether a debtor-creditor relationship represented by a bona fide debt exists, the Court considers the facts and circumstances.  Fisher v. Commissioner, 54 T.C. 905, 909 (1970).  The test in making such a determination is whether the debtor is under an unconditional obligation to repay the creditor and whether the creditor intends to enforce repayment of the obligation.  Id. at 909-910;  sec. 1.166-1(c), Income Tax Regs.  The objective indicia of a bona fide debt include whether a note or other evidence of indebtedness existed and whether interest was charged.  See Clark v. Commissioner, 18 T.C. 780, 783 (1952), affd. 205 F.2d 353 (2d Cir. 1953).  Also considered are the existence of security or collateral, the demand for

repayment, records that may reflect the transaction as a loan, and the borrower's solvency at the time of the loan. See Road Materials, Inc. v. Commissioner, 407 F.2d 1121 (4th Cir. 1969), affg. in part, vacating in part, and remanding T.C. Memo. 1967-187; Jewell Ridge Coal Corp. v. Commissioner, 318 F.2d 695, 699 (4th Cir. 1963), affg. T.C. Memo. 1962-194.

Petitioner did not provide sufficient evidence indicating the existence of a bona fide debt. The record clearly indicates that petitioner entered into an investment agreement with Carter. A contribution to capital is not a debt within the meaning of section 166. Raymond v. United States, 511 F.2d 185, 189 (6th Cir. 1975); Hambuechen v. Commissioner, 43 T.C. 90, 99-100 (1964); sec. 1.166-1(c), Income Tax Regs. Petitioner himself characterized his involvement with Carter as an investment in a highly speculative business which he believed had the potential for great rewards. Although promissory notes were issued to petitioner in connection with the advances, no repayments were ever made with respect to the notes, and petitioner did not demand such repayments. Additionally, no security or collateral was ever offered in exchange for petitioner's advances to Carter. We find that petitioner's advances to Carter can fairly be characterized as investments and not as debt within the meaning of section 166.

As a result of petitioner's failure to prove the existence of bona fide debt, we need not consider whether the "debt" became

worthless in 1984.  Accordingly, we find that petitioner is not entitled to a bad debt deduction in taxable year 1984. Respondent's determination is sustained on this issue.

Petitioner argues in the alternative that he is entitled to deduct the loss on his investment in Carter as a theft loss for 1984.  Respondent argues otherwise.  Section 165 allows as a deduction a theft loss sustained during the taxable year and not compensated for by insurance or otherwise.  Sec. 165(a), (c)(3). Section 165(e) provides that the deduction for such loss shall be treated as sustained in the taxable year in which the taxpayer discovered the loss.  Sec. 1.165-8(a)(2), Income Tax Regs. Petitioner bears the burden of proving a loss by theft, the amount of the loss, and the year in which the loss was discovered.  Rule 142(a).

Petitioner has not met his burden of proving either the amount of the alleged theft loss or the year in which the loss was discovered.  Accordingly, based upon the record in the instant case, we find that petitioner has not provided sufficient evidence to establish his entitlement to a theft loss under section 165 for taxable year 1984.

Issue 3.  Unemployment Compensation

Petitioner received unemployment compensation in the amount of $5,312 in 1984.  Section 85(a) provides that if the sum of a taxpayer's adjusted gross income and the taxpayer's unemployment compensation is greater than the "base amount", then the amount

of unemployment compensation includable in gross income is equal to the lesser of one-half of the amount of the excess of such sum over the base amount, or the amount of the unemployment compensation. Petitioner's base amount equals $12,000. See sec. 85(b)(1). Petitioner argues that the unemployment compensation he received is not taxable under section 85 because his adjusted gross income in 1984 fell below his base amount of $12,000.

Our determination that petitioner is not entitled to any deductions or an investment tax credit with respect to his dealings with Encore and that he is not entitled to a business bad debt deduction in connection with Carter results in an upward adjustment in petitioner's adjusted gross income for 1984, bringing him over the base amount of $12,000. Accordingly, the $5,312 petitioner received in unemployment compensation is includable in his gross income for 1984. We sustain respondent's determination on this issue.

Issue 4. Self-Employment Tax

Section 1401 imposes a self-employment tax on the self-employment income of every individual. Individuals whose net self-employment income equals or exceeds $400 during the taxable year are required to report such income. Sec. 6017. Petitioner argues that his net self-employment income did not exceed $400 in 1984. We have determined, however, that petitioner is not entitled to various claimed deductions, causing petitioner's net

self-employment income to be greater than $400 in taxable year 1984. Accordingly, respondent is sustained on this issue.

Issue 5. Negligence

Section 6653(a)(1) provides for an addition to tax equal to 5 percent of any underpayment if any part of the underpayment is due to negligence or intentional disregard of rules and regulations. Negligence is defined as a lack of due care or the failure to act as a reasonable person would act under similar circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). Petitioner bears the burden of proving that no part of the underpayment for the year at issue is due to negligence or intentional disregard of rules and regulations. Rule 142(a); Bixby v. Commissioner, 58 T.C. 757 (1972).

Petitioner argues that he did not rely on the representations made by Encore in determining whether to enter into the lease transaction. Petitioner contends that he sought the professional advice of a number of individuals with respect to his investment in Encore and determined that Encore had a good reputation, that the tax advantages claimed by Encore were supported by law, and that the masters were of marketable quality. Petitioner argues that he did what a reasonable person would have done under the circumstances.

Petitioner had no experience in the record industry prior to his involvement with Encore. Petitioner was unfamiliar with the recording artists and failed to seek an independent appraisal of

either the master's value or its potential for profit. Petitioner did not listen to the master or determine its quality before signing the master recording lease. Petitioner argues that he sought and relied upon the advice of several people in the record industry. While petitioner did casually elicit information from several individuals, petitioner failed to provide sufficient evidence indicating that he sought the advice of a professional investment counselor. The record indicates that petitioner primarily contacted Encore promoters and individuals at the various distribution companies connected with Encore. Investors cannot escape the negligence penalty by relying on the advice of persons who are not professional investment counselors. Pasternak v. Commissioner, 990 F.2d at 903; Rybak v. Commissioner, 91 T.C. 524, 565 (1988).

We find that a reasonably prudent person would have sought the advice of an independent tax adviser in a situation such as this where the return is immediately several times as much as the initial investment. See Pasternak v. Commissioner, supra at 903; McCrary v. Commissioner, 92 T.C. 827, 850 (1989); Harris v. Commissioner, T.C. Memo. 1981-46 ("To anyone * * * not incorrigibly addicted to the 'free lunch' philosophy of life, the entire scheme had to have been seen as a wholly transparent sham.").

Based upon the record in the instant case, we find that petitioner's actions do not approach the actions that a

reasonable and ordinarily prudent person would have taken under the circumstances. Accordingly, petitioner is liable for the addition to tax due to negligence for taxable year 1984. Respondent is sustained on this issue.

Issue 6. Valuation Overstatement

Respondent determined that petitioner's underpayment in 1984 is, in part, attributable to a valuation overstatement. Section 6659 provides for an addition to tax on an underpayment of $1,000 or more attributable to a valuation overstatement.

A valuation overstatement is defined to include a claim on a return of a valuation of 150 percent or more of the correct valuation. Sec. 6659(c); see Leuhsler v. Commissioner, 963 F.2d 907, 911 (6th Cir. 1992), affg. T.C. Memo. 1991-179. The amount of the addition to tax equals the product of the applicable percentage, as determined under section 6659(b), and the underpayment of tax resulting from the overvaluation. Sec. 6659(a).[1]

We have determined that petitioner's claimed investment tax credit in 1984 was based upon a gross overvaluation of the subject master. Petitioner claimed an investment tax credit based on the master's purported value of $496,000. We have determined, however, that the master's actual value equaled

_____

[1]Sec. 659 was enacted to discourage taxpayers from investing in abusive tax shelters that rely on the significant overvaluation of shelter assets in order to produce the desired losses that serve to reduce the investors' tax liabilities. See H. Rept. 97-201, at 243 (1981), 1981-2 C.B. 352, 398.

$3,000 to $5,000.  Accordingly, without further analysis, we find that petitioner is liable for the addition to tax due to a valuation overstatement under section 6659.  Respondent is sustained on this issue.

Issue 7.  Increased Interest

Section 6621(c) provides for an interest rate of 120 percent of the statutory rate where there is an underpayment of taxes in excess of $1,000 attributable to one or more enumerated "tax motivated transactions" in any year.  The increased interest rate applies to interest accrued after December 31, 1984, even though the transaction was entered into prior to that date. Solowiejczyk v. Commissioner, 85 T.C. 552 (1985), affd. without published opinion 795 F.2d 1005 (2d Cir. 1986).

Tax-motivated transactions include valuation overstatements within the meaning of section 6659(c).  Sec. 6621(c)(3)(A)(i). As we have determined that petitioner is liable for the addition to tax due to a valuation overstatement, we sustain respondent on this issue.  Accordingly, we find that petitioner is liable for the increased rate of interest under section 6621(c).

Issue 8.  Penalty Under Section 6673

Respondent filed a motion in the instant case for a penalty against petitioner under section 6673.  Whenever it appears that proceedings before this Court have been instituted or maintained by the taxpayer primarily for delay, or the taxpayer's position in such proceedings is frivolous or groundless, or the taxpayer

unreasonably failed to pursue available administrative remedies, section 6673 provides that the Court may require the taxpayer to pay a penalty to the United States. As to positions taken after December 31, 1989, in proceedings which are pending or commenced after that date, the maximum amount of the penalty is $25,000.

Proceedings may be treated as instituted primarily for delay where a taxpayer does not provide the Commissioner with information or offer evidence at trial. Stamos v. Commissioner, 95 T.C. 624, 638 (1990), affd. without published opinion 956 F.2d 1168 (9th Cir. 1992). A position is groundless if the taxpayer knew very well in advance of trial that there was no basis in law or fact for the deductions he or she claimed. Horn v. Commissioner, 90 T.C. 908, 946 (1988). If a taxpayer knew or should have known that his or her position is without merit, a court may and should impose sanctions. Coleman v. Commissioner, 791 F.2d 68, 71-72 (7th Cir. 1986). Unreasonable failure to pursue available administrative remedies includes unreasonable failures to respond to the Commissioner's requests to substantiate deductions. Birth v. Commissioner, 92 T.C. 769, 774 (1989).

Wolf v. Commissioner, T.C. Memo. 1991-212, affd. 4 F.3d 709 (9th Cir. 1993), was the test case for taxpayers involved in the Encore Leasing Tax Shelter Program. Petitioner was provided with the opportunity to sign a stipulation agreeing to be bound by the outcome in Wolf v. Commissioner, supra. Petitioner did not agree

to such stipulation.  Respondent advised petitioner that if his case were litigated, respondent would file a motion for a penalty under section 6673.  In Wolf v. Commissioner, supra, respondent was sustained on all issues including the additions to tax and a damage award under section 6673.  Respondent argues that the instant case is indistinguishable from Wolf, and as such, is frivolous, meriting an award of damages under section 6673.

We have carefully considered the particular circumstances of the instant case, and although we have found the lease transaction to be devoid of economic substance, we do not find petitioner's position to be frivolous.  We have determined that petitioner lacked due care and did not take the steps an ordinarily prudent person would have taken with respect to claiming the deductions and investment tax credit attributable to his investment in Encore; however, in the particular setting of this case and exercising our discretion, we decline to award a penalty under section 6673 in this proceeding.  Accordingly, respondent's motion for a penalty under section 6673 is denied.

To reflect the foregoing,

An appropriate order and

decision will be entered.