T.C. Summary Opinion 2002-32

UNITED STATES TAX COURT

JANET L. WIEST, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

RAYMOND A. WIEST, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 6294-00S, 6302-00S.      Filed April 2, 2002.

<u>Robert S. Schriebman</u> and <u>Patrick E. McGinnis</u>, for

petitioners.

<u>Timothy S. Sinnott</u>, for respondent.

ARMEN, <u>Special Trial Judge</u>: These consolidated cases were

heard pursuant to the provisions of section 7463 of the Internal

Revenue Code in effect at the time that the petitions were

filed.[1]  The decisions to be entered are not reviewable by any

_____

[1] Unless otherwise indicated, all subsequent section
references are to the Internal Revenue Code in effect for 1983,
                                        (continued...)

other court, and this opinion should not be cited as authority.

In so-called affected items notices of deficiency, respondent determined additions to tax to petitioners' Federal income tax for the year and in the amounts as shown below:

|  | Additions to Tax | | |
|---|---|---|---|
| Year | Sec. 6653(a)(1) | Sec. 6653(a)(2) | Sec. [2]6661 |
| 1983 | $272 | [1]$5,435 | $1,359 |

[1] The notice of deficiency mistakenly equates the amount of the addition to tax with the amount of the deficiency in income tax (see infra "J"). Prior to trial, respondent filed an answer to claim an increased addition to tax pursuant to sec. 6214(a). The increase, in the amount of $7,834.69, is purely computational in nature.

[2] The first page of the notice of deficiency mistakenly references sec. 6662(d), which section is the successor to sec. 6661 and is applicable for returns the due date for which (determined without regard to extensions) is after December 31, 1989. See Omnibus Budget Reconciliation Act of 1989, Pub. L. 101-239, sec. 7721(a), (c)(2), (d), 103 Stat. 2395-2400.

After concessions by the parties,[2] the issues for decision are as follows:

(1) Whether petitioner Raymond Wiest (petitioner) is liable for additions to tax under section 6653(a)(1) and (2) for

---

[1](...continued)
the taxable year in issue.

[2] Petitioners concede that the notice of deficiency is valid. Cf. Scar v. Commissioner, 814 F.2d 1363 (9th Cir. 1987), revg. 81 T.C. 855 (1983).
Respondent concedes, and petitioner Raymond A. Wiest does not dispute, that pursuant to sec. 6015, petitioner Janet L. Wiest is entitled to relief from joint and several liability for the additions to tax.

negligence or intentional disregard of rules or regulations. We hold that petitioner is liable for such additions.

(2) Whether petitioner is liable for the addition to tax under section 6661 for substantial understatement of tax liability. We hold that petitioner is liable for such addition.

The foregoing two issues relate to the participation of petitioner as a limited partner in a jojoba partnership known as San Nicholas Research, Ltd.

## Background

Some of the facts have been stipulated, and they are so found. The stipulated facts and attached exhibits are incorporated herein by this reference.

Petitioner resided in Riverside, California, at the time that his petition was filed with the Court.

## A. Petitioner's Background and Experience

After graduating from high school in 1955, petitioner attended San Bernardino Valley Junior College for 1 year and California State University at Long Beach for an additional year. While in college, petitioner majored in industrial arts. He did not take any business or accounting courses, nor did he take any courses in either Federal or State taxation.

During 1983, the taxable year in issue, petitioner's principal occupation was part owner and operator of a successful equipment rental company known as Wiest Rentals in Riverside,

California. The company, which was family owned, rented construction equipment, such as dump trucks, skip loaders, and air compressors, and sold building materials, such as rock, sand, and cement blocks.

In 1983, petitioner was also a member of the board of directors of Riverside Thrift & Loan Association, a state-chartered financial institution in Riverside, California. As a board member, petitioner received director's fees in the amount of $6,320.

In 1983, petitioner had fractional interests in commercial real estate that produced net rental income. Petitioner also received fees in the amount of $9,526 for managing one of these properties.

In 1983, petitioner also had an interest in some orange groves in southern California. The orange groves produced minimal income.[3]

In 1983, petitioner was financially well off and sophisticated. Without regard to partnership and farm losses, petitioner's reported income exceeded $200,000 for that year, including (but not limited to): (1) Compensation from Wiest Rentals in the amount of $36,500; interest income in the amount of $52,991; capital gain (net of the 60 percent deduction under

---

[3] On his Schedule F, Farm Income and Expenses, petitioner reported a gross profit of $262 and deducted expenses of $7,181, for a net loss of $6,919.

section 1202) in the amount of $64,694;[4] net rental income in the amount of $33,073; and other income (consisting principally of rental management fees and director's fees) in the amount of $16,006. In addition, petitioner had equity interests in: (1) A partnership known as M&W Construction;[5] (2) a partnership known as Canyon Crest Lots; (3) a partnership known as The Attic; (4) a partnership known as The Thrift Land Company; (5) a partnership known as Sovereign Land Company; (6) San Nicholas, Ltd. (see infra "E" through "K"); (7) two parcels of commercial real estate; and (8) an S corporation.

Prior to 1983, petitioner had an interest in a family-owned ranch. The ranch, which was located in northern California, and grazed about 250 head of cattle, was operated on a day-to-day basis by petitioner's father, who lived in the area. The ranch was sold in November 1980.

B. Petitioner's Friend and Associate William G. Kellen

William G. Kellen (Mr. Kellen) was petitioner's friend and business associate. Like petitioner, Mr. Kellen was a member of the board of directors of Riverside Thrift & Loan Association.

---

[4] Petitioner's capital gain included an installment sale in March 1983 of 69,971 shares of Riverside Thrift & Loan Association at a gross profit of $265,844.

[5] Petitioner's share of partnership income from M&W Construction in 1983 was $6,307. This income is apparently the basis of petitioner's testimony that his livelihood in 1983 was based, in part, on "some contracting".

Mr. Kellen was a general partner and tax matters partner of four limited jojoba partnerships:  Utah Jojoba Research, Ltd. (Utah Jojoba); Blythe Jojoba I Research, Ltd. (Blythe Jojoba I); Blythe Jojoba II Research, Ltd. (Blythe Jojoba II); and Desert Center Jojoba Research, Ltd. (Desert Center Jojoba).  Each of these partnerships was similar, if not identical, to San Nicholas Research, Ltd., described infra in "E" through "H".

Prior to 1982, Mr. Kellen did not have any experience in growing jojoba, nor did he have any experience in either the research or development of jojoba.  Prior to 1982, Mr. Kellen's knowledge concerning jojoba was limited to articles that he had read in various magazines and a general familiarity with the existence of an experimental jojoba plantation located at the University of California at Riverside.  Mr. Kellen did not consider himself to be an expert in jojoba in 1983.

In 1983, Mr. Kellen was actively engaged in the practice of law, specializing in the formation of financial institutions such as banks, savings and loan associations, and thrift and loan associations.  Mr. Kellen did not have any expertise in accounting or tax matters, nor did he ever attempt to render advice on those subjects.

C.  Petitioner's Friend and Associate E.T. Jacobs

E.T. Jacobs (Mr. Jacobs) was petitioner's friend and business associate.  Like petitioner, Mr. Jacobs was a member of

the board of directors of Riverside Thrift & Loan Association.

From 1957 to 1973, Mr. Jacobs worked for the Internal Revenue Service (IRS) as a revenue agent and later as an examination manager. As a revenue agent, Mr. Jacobs served as a dairy specialist and later as a cattle feeding specialist. As a manager, Mr. Jacobs supervised the examination of agricultural businesses in Riverside and Imperial Counties in southern California.

After resigning from the IRS, Mr. Jacobs entered private practice as an accountant. In 1983, he maintained his own practice as a certified public accountant.

In 1982, Mr. Jacobs became interested in the farming of jojoba in Desert Center, California. Mr. Jacobs also sold limited partnership interests in a number of jojoba partnerships.

At no time relevant to this case did Mr. Jacobs have any experience or expertise in the research or development of jojoba.

D. Petitioner's Friend and Associate Eugene C. Pace

Eugene C. Pace (Mr. Pace) was petitioner's friend and business associate. Like petitioner, Mr. Pace was a member of the board of directors of Riverside Thrift & Loan Association. Like Mr. Kellen, Mr. Pace was an attorney.

Mr. Pace was president of U.S. Agri, see infra "G", and a member of its board of directors.

Prior to 1983, Mr. Pace did not have any experience in growing jojoba, nor did he have any experience in either the research or development of jojoba.

E.  Petitioner's Investment in San Nicholas, Ltd.

Petitioner was introduced to jojoba by Mr. Pace, who provided petitioner with a copy of a private placement memorandum dated October 10, 1983 (see infra "F" and "H"), for San Nicholas Research, Ltd. (San Nicholas or the partnership).[6]  Thereafter, on December 30, 1983, petitioner signed a subscription agreement and purchased five limited partnership units (a 3.9-percent interest) in San Nicholas.

The general partner and tax matters partner of San Nicholas was Alfred M. Clancy.

Petitioner purchased the partnership units pursuant to the aforementioned private placement memorandum.  Petitioner paid $2,790 per limited partnership unit, or a total of $13,950, for his five units in San Nicholas.  Of this amount, $1,140 per unit, or $5,700 for 5 units, was paid in cash.  The balance, $1,650 per unit or $8,250 for five units, was payable pursuant to a 10-year

---

[6] Mr. Pace also provided petitioner with a promotional videotape, which was produced by U.S. Agri, see infra "G", and which featured Mr. Pace, that described jojoba as "liquid gold" and as "the industrial crop of the future", which would be cultivated in "some of the most hostile land anywhere".

promissory note.[7]

Prior to investing in San Nicholas, petitioner did not have any experience or expertise in jojoba, nor did petitioner have any experience or expertise in the area of research or development of jojoba.

Petitioner's decision to invest in San Nicholas was influenced by the fact that Mr. Pace, his friend and business associate, was president of U.S. Agri, see infra "G", and that Mr. Kellen, another of petitioner's friends and business associates, had also invested in San Nicholas.[8]

Petitioner's decision to invest was also influenced by petitioner's belief that an investment in San Nicholas offered tax benefits.

Prior to investing in San Nicholas, petitioner did not consult any attorney.[9]

_____

[7] The note, which was recourse in form, contemplated payments of interest only for the first 5 years. As matters actually transpired, late in the 1980s, the limited partners were given the option of paying a steeply discounted percentage of the principal in cash. The record does not disclose whether petitioner elected this option.

[8] Mr. Kellen's investment in San Nicholas also culminated in a case in this Court. See Kellen v. Commissioner, T.C. Memo. 2002-19; see also Utah Jojoba I Research v. Commissioner, T.C. Memo. 1998-6, discussed infra in subdivision "J", regarding Mr. Kellen's involvement in another jojoba partnership.

[9] Although Mr. Kellen was an attorney, he never rendered any legal advice to petitioner concerning San Nicholas. Indeed, petitioner never consulted Mr. Kellen in his capacity as an
(continued...)

F.  Putative Nature of San Nicholas' Business

According to the private placement memorandum dated October 10, 1983 (the offering memorandum), San Nicholas was formed in order "to undertake a comprehensive research and development program on the plant Simmondsia Chinesis (Jojoba)."  The offering memorandum described how this program was to be carried out:

> The Partnership will enter into a research and development contract * * * with U.S. Agri Research and Development Corp. (the "R & D Contractor"), who will conduct the experiments in various test sites * * * as well as its laboratory or greenhouse facilities that it in its sole discretion deems advisable.  In addition, the R & D Contract sets forth that a site in the vicinity of Desert Center and Blythe, California of from 30-50 acres will be delineated as the applied research site upon which all technology and improved cultivars developed on behalf of the Partnership during the term of the contract will be placed "in field." The Partnership will also have the right but not be obligated to enter into a License Agreement * * * to license to U.S. Agri Research and Development Corp. all technology developed on behalf of the Partnership for a period of forty (40) years and receive therefrom an amount equal to 85% of the products produced from the developed technology.[10]

---

[9](...continued)
attorney; rather, petitioner merely "chatted" with Mr. Kellen as a friend and business associate.

In addition, although Mr. Pace was an attorney, petitioner never consulted him in that capacity.  Indeed, any advice that Mr. Pace may have rendered was offered in his capacity as an interested party to the San Nicholas promotion, see infra "G", a fact of which petitioner was aware.

[10]  Although San Nicholas may not have been obligated to enter into a license agreement with U.S. Agri Research and Development Corp., it was a foregone conclusion that it would do so.  Indeed, the research and development (R&D) contract and the license agreement were executed concurrently.  Notably, execution
(continued...)

Copies of the research and development (R&D) contract and the license agreement referred to in the preceding paragraph were attached as exhibits to the offering memorandum. The R&D contract identified U.S. Agri Research and Development Corp. (U.S. Agri) as a party to the contract and the R&D contractor thereunder. The license agreement identified U.S. Agri as a party to the contract and the licensee thereunder.

G.  U.S. Agri

As previously indicated, the offering memorandum identified U.S. Agri as the R&D contractor under the R&D contract and as the licensee under the license agreement. U.S. Agri was also the R&D contractor and the licensee for Utah Jojoba, Blythe Jojoba I, Blythe Jojoba II, and Desert Center Jojoba.

As previously indicated, Mr. Pace was the president of U.S. Agri and a member of its board of directors. Mr. Kellen also served as a member of U.S. Agri's board until he became general partner of Utah Jojoba, Blythe Jojoba I, Blythe Jojoba II, and Desert Center Jojoba in late 1982.

Mr. Pace and Mr. Kellen were close personal friends and business associates for a number of years before the formation of San Nicholas in late 1983.

---

[10](...continued)
of the license agreement by San Nicholas served to automatically terminate the R&D contract pursuant to the terms of the latter contract. See infra "J".

H.  Cautionary Language in the San Nicholas Offering Memorandum

The face of the offering memorandum warned, in block letters, that "THIS OFFERING INVOLVES A HIGH DEGREE OF RISK". The offering memorandum also included the following cautionary language in block letters:

> PROSPECTIVE INVESTORS ARE CAUTIONED NOT TO CONSTRUE
> THIS MEMORANDUM OR ANY PRIOR OR SUBSEQUENT
> COMMUNICATIONS AS CONSTITUTING LEGAL OR TAX ADVICE.
> * * * INVESTORS ARE URGED TO CONSULT THEIR OWN COUNSEL
> AS TO ALL MATTERS CONCERNING THIS INVESTMENT.
>
> *       *       *       *       *       *       *
>
> THERE IS NO PUBLIC OR OTHER MARKET FOR THE UNITS, NOR
> WILL SUCH MARKET DEVELOP.
>
> *       *       *       *       *       *       *
>
> THE PURCHASE OF SUCH UNITS DESCRIBED IN THIS MEMORANDUM
> INVOLVES A HIGH DEGREE OF RISK (SEE "RISK FACTORS") AND
> SHOULD BE CONSIDERED ONLY BY PERSONS WHO CAN AFFORD THE
> TOTAL LOSS OF THEIR INVESTMENT.
>
> *       *       *       *       *       *       *
>
> EACH PURCHASER OF THE UNITS HEREIN SHOULD AND IS
> EXPECTED TO CONSULT WITH HIS OWN TAX ADVISOR AS TO THE
> TAX ASPECTS.

In addition, the offering memorandum limited the sale of partnership units to investors with a net worth (exclusive of home, furnishings, and automobiles) of at least $150,000, or investors whose net worth was at least $50,000 (exclusive of home, furnishings, and automobiles) and who anticipated that, for the taxable year of the investment, they would have gross income of at least $65,000 or taxable income, a portion of which, but

for tax-advantaged investments, would be subject to Federal income tax at a marginal rate of 50 percent.

The offering memorandum included a section entitled "Risk Factors", which was the single longest section. It began with a general warning:

> The purchase of the interests offered hereby involves various risk factors. Investment in the Partnership * * * involves an extremely high degree of risk. Investors should consider carefully the various risk factors set forth in this and other portions of this Memorandum. Investment in the Partnership is suitable only for persons of substantial financial means who will not require liquidity in the investment. Investors must be prepared for the possible loss of their entire investment.

The offering memorandum then proceeded to discuss a number of specific, and significant, risk factors associated with an investment in San Nicholas. Among those risks, the offering memorandum warned: (1) Research and development risks were so great that an investment in San Nicholas should be considered "highly speculative"; (2) the general partner had no previous experience in dealing in jojoba; (3) there was no structured market or distribution system for jojoba; (4) there were no facilities dedicated to the processing of jojoba; (5) commercial applications of jojoba are not extensive; (6) the general partner had not conducted any market analysis or similar studies; (7) there was no assurance of any increase in marketing or production facilities or in the demand for jojoba; (8) in the absence of any such increase, the production of jojoba might be unprofitable,

regardless of any technology that might be developed by the R&D contractor; and (9) there was the likelihood of audit by the IRS. Indeed, the discussion concerning the tax risks associated with an investment in San Nicholas constituted half of the section on "Risk Factors".

The offering memorandum also included projections of revenue, cashflow, and taxable income or loss. Investors were warned, however, that those projections, which had been prepared for the general partner, had not been audited and that they should not be relied on to indicate the actual results that might be attained.

## I.  Petitioner's 1983 Schedule K-1 and Income Tax Return

Petitioner received a Schedule K-1, Partner's Share of Income, Credits, Deductions, etc., from San Nicholas for 1983. The Schedule K-1 reported that petitioner's distributive share of partnership loss from San Nicholas was $12,354 for that year.

Petitioner timely filed a Federal income tax return, Form 1040, for 1983.[11]  Petitioner attached to his return Schedule E, Supplemental Income Schedule, and claimed thereon a loss from San Nicholas in the amount of $12,354.  Petitioner then offset this loss against his other income.  See supra "A".

_____

[11] The return was prepared by Lee R. Jeppson, Jr. (Mr. Jeppson), a member of an accounting firm in Riverside, California.  In preparing petitioner's return, Mr. Jeppson relied on the Schedule K-1 that was provided by petitioner.

J.  Jojoba Partnership Litigation

San Nicholas was examined by the Internal Revenue Service, and a notice of final partnership administrative adjustment, FPAA, was ultimately issued to the partnership.  In December 1991, Alfred M. Clancy (Mr. Clancy), the general partner and tax matters partner of San Nicholas, commenced a TEFRA partnership proceeding in this Court.[12]  Subsequently, in November 1993, Mr. Clancy and the Commissioner agreed to be bound by the decision to be entered in Utah Jojoba I Research v. Commissioner, docket No. 7619-90, a TEFRA partnership proceeding involving Utah Jojoba that had previously been commenced by Mr. Kellen in his capacity as tax matters partner of that partnership.

In Utah Jojoba I Research v. Commissioner, T.C. Memo. 1998-6, the Court made detailed findings of fact related to the jojoba limited partnerships,[13] Mr. Kellen, U.S. Agri, and Mr. Pace.  The Court described the R&D contract between the partnerships and U.S. Agri as "mere window dressing" and held that the partnerships did not, directly or indirectly, engage in research

---

[12] The TEFRA partnership proceeding was assigned docket No. 29994-91.  TEFRA stands for the Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. 97-248, 96 Stat. 324.  See secs. 6221-6232; N.C.F. Energy Partners v. Commissioner, 89 T.C. 741, 744 (1987); Maxwell v. Commissioner, 87 T.C. 783, 789 (1986).

[13] At least 18 docketed cases were bound by stipulation to the outcome of Utah Jojoba I Research v. Commissioner, docket No. 7619-90.

or experimentation and that the partnerships lacked a realistic prospect of entering into a trade or business. In upholding the Commissioner's disallowance of research and experimental expenditures, the Court concluded that the agreements between the partnerships and the R&D contractor (U.S. Agri) had been designed and entered into solely to provide a mechanism to disguise the capital contributions of limited partners as currently deductible expenditures.[14] The Court stated that the activities of the partnerships were "another example of efforts by promoters and investors in the early 1980s to reduce the cost of commencing and engaging in the farming of jojoba by claiming, inaccurately, that capital expenditures in jojoba plantations might be treated as research or experimental expenditures for purposes of claiming deductions under section 174." Id.

In November 1998, Mr. Clancy, acting in his capacity as tax matters partner of San Nicholas, consented to entry of decision against the partnership. Subsequently, in December 1998, the Court entered decision against San Nicholas pursuant to the Commissioner's Motion for Entry of Decision under Rule 248(a).[15] Thereafter, the Commissioner assessed a deficiency in

---

[14] In other words, in order to decrease the limited partners' cost of investing in the jojoba partnerships, large up-front deductions were manufactured from expenditures that were actually capital contributions.

[15] All Rule references are to the Tax Court Rules of Practice and Procedure.

petitioner's income tax for 1983 in the amount of $5,435 and mailed a so-called affected items notice of deficiency to petitioner determining additions to tax for negligence and substantial understatement of tax liability. See sec. 6230(a); N.C.F. Energy Partners v. Commissioner, 89 T.C. 741, 744 (1987); Maxwell v. Commissioner, 87 T.C. 783, 792 n.9 (1986). It is those additions to tax that are in issue in the present cases.

K. Epilogue: Demise of the Jojoba Partnerships

The jojoba partnerships proved to be financial failures. In October 1991, some 30 to 40 jojoba partnerships under contract with U.S. Agri were consolidated into one large limited partnership, Jojoba Plantation Ltd. Sometime thereafter, Jojoba Plantation Ltd. filed a petition in bankruptcy under chapter 7 of the Bankruptcy Act. See Utah Jojoba I Research v. Commissioner, supra.

At trial, petitioner's witness, Mr. Kellen, testified that the jojoba partnerships failed because of the Internal Revenue Service.[16] At a previous trial, Mr. Kellen testified that "the collapse, basically, of the tax incentive for doing jojoba" contributed to the partnerships' failure. See id.

---

[16] Petitioner's other witness, Kathleen M. Jacobs, suggested a different reason: That no commercially viable method of harvesting jojoba was ever developed, or, as Ms. Jacobs testified, that "it was impossible to harvest."

## Discussion

We have decided many jojoba cases involving additions to tax for negligence and substantial understatement of tax liability.[17] We have found the taxpayers liable for additions to tax for negligence in all of those cases; likewise, we have found the taxpayers liable for the addition to tax for substantial understatement of tax liability in all of those cases that have presented that issue.

### I.   Section 6653(a)(1) and (2) Negligence

The first issue for decision is whether petitioner is liable for additions to tax under section 6653(a)(1) and (2) with respect to the underpayment of tax attributable to petitioner's investment in San Nicholas.  Petitioner has the burden of proof to show that he is not liable for these additions to tax.[18]  See

---

[17] See, e.g., Finazzo v. Commissioner, T.C. Memo. 2002-56; Welch v. Commissioner, T.C. Memo. 2002-39; Kellen v. Commissioner, T.C. Memo. 2002-19; Lopez v. Commissioner, T.C. Memo. 2001-278; Christensen v. Commissioner, T.C. Memo. 2001-185; Serfustini v. Commissioner, T.C. Memo. 2001-183; Carmena v. Commissioner, T.C. Memo. 2001-177; Nilsen v. Commissioner, T.C. Memo. 2001-163; Ruggiero v. Commissioner, T.C. Memo. 2001-162; Robnett v. Commissioner, T.C. Memo. 2001-17; Harvey v. Commissioner, T.C. Memo. 2001-16; Hunt v. Commissioner, T.C. Memo. 2001-15; Fawson v. Commissioner, T.C. Memo. 2000-195; Downs v. Commissioner, T.C. Memo. 2000-155; Glassley v. Commissioner, T.C. Memo. 1996-206;  Stankevich v. Commissioner, T.C. Memo. 1992-458.

[18] It must be acknowledged that respondent bears the burden of proof to show that petitioner is liable for the increase in the addition to tax under sec. 6653(a)(2).  See supra, p. 2, table, note 1; Rule 142(a).  However, in the present case, the

(continued...)

Addington v. Commissioner, 205 F.3d 54, 58 (2d Cir. 2000), affg.
Sann v. Commissioner, T.C. Memo. 1997-259; Bixby v. Commissioner,
58 T.C. 757, 791-792 (1972); Anderson v. Commissioner, T.C. Memo.
1993-607, affd. 62 F.3d 1266 (10th Cir. 1995).  See generally
Rule 142(a); INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84
(1992); Welch v. Helvering, 290 U.S. 111, 115 (1933).[19]

Section 6653(a)(1) imposes an addition to tax in an amount
equal to 5 percent of the underpayment of tax if any part of the
underpayment is due to negligence or intentional disregard of
rules or regulations.  Section 6653(a)(2) imposes another
addition to tax in an amount equal to 50 percent of the interest
due on the portion of the underpayment attributable to negligence
or intentional disregard of rules or regulations.

Negligence is defined as the failure to exercise the due
care that a reasonable and ordinarily prudent person would
exercise under like circumstances.  See Anderson v. Commissioner,
62 F.3d 1266, 1271 (10th Cir. 1995), affg. T.C. Memo. 1993-607;

[18](...continued)
increase is purely computational in nature, and respondent has
convincingly demonstrated the proper amount of the addition to
tax.  Accordingly, our analysis proceeds on the basis that
petitioner bears the burden of proof regarding his liability for
this addition to tax.  In any event, we would resolve this issue
for respondent based on a preponderance of the evidence.

[19]  Cf. sec. 7491(c), effective for court proceedings
arising in connection with examinations commencing after July 22,
1998.  In the present case, the examination of petitioner's
income tax return for 1983 commenced well before July 22, 1998.

Neely v. Commissioner, 85 T.C. 934, 947 (1985).  The focus of inquiry is the reasonableness of the taxpayer's actions in light of the taxpayer's experience and the nature of the investment. See Henry Schwartz Corp. v. Commissioner, 60 T.C. 728, 740 (1973); see also Sacks v. Commissioner, 82 F.3d 918, 920 (9th Cir. 1996) (whether a taxpayer is negligent in claiming a tax deduction "depends upon both the legitimacy of the underlying investment, and the due care in the claiming of the deduction"), affg. T.C. Memo. 1994-217; Turner v. Commissioner, T.C. Memo. 1995-363.  In this regard, the determination of negligence is highly factual.

Under some circumstances, a taxpayer may avoid liability for negligence if reasonable reliance on a competent professional adviser is shown.  See United States v. Boyle, 469 U.S. 241, 250-251 (1985); Freytag v. Commissioner, 89 T.C. 849, 888 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), affd. on another issue 501 U.S. 868 (1991).  However, reliance on professional advice, standing alone, is not an absolute defense to negligence, but rather a factor to be considered.  See Freytag v. Commissioner, supra.  For reliance on professional advice to excuse a taxpayer from negligence, the taxpayer must show that the professional had the requisite expertise, as well as knowledge of the pertinent facts, to provide informed advice on the subject matter.  See David v. Commissioner, 43 F.3d 788, 789-790 (2d Cir. 1995), affg.

T.C. Memo. 1993-621; Goldman v. Commissioner, 39 F.3d 402, 407 (2d Cir. 1994), affg. T.C. Memo. 1993-480; Freytag v. Commissioner, supra.

The facts pertinent to the present case relating to the structure, formation, and operation of San Nicholas are as found above and as discussed in Utah Jojoba I Research v. Commissioner, T.C. Memo. 1998-6. The offering memorandum identified U.S. Agri as the contractor under the R&D contract. In addition, a license agreement between San Nicholas and U.S. Agri granted U.S. Agri the exclusive right to use all technology developed for the partnership for 40 years in exchange for a royalty of 85 percent of the products produced from such technology. The R&D contract and the license agreement were executed concurrently.

According to its terms, the R&D contract expired upon the partnership's execution of the license agreement. Because the two contracts were executed concurrently, amounts paid by the partnership to U.S. Agri were not paid pursuant to a valid R&D contract but rather were passive investments in a farming venture under which the investors' return, if any, was to be in the form of royalties pursuant to the license agreement. Thus, as the Court held in Utah Jojoba I Research v. Commissioner, supra, the partnership was never engaged in research or experimentation, either directly or indirectly. Moreover, the Court found that U.S. Agri's attempt to farm jojoba commercially did not

constitute R&D, thereby concluding that the R&D contract was designed and entered into solely to decrease the limited partners' cost of investing in an jojoba partnership through large, upfront deductions for expenditures that were actually capital contributions. The Court further concluded that the partnership was not involved in a trade or business and had no realistic prospect of entering into a trade or business with respect to any technology that was to be developed by U.S. Agri. Id.

Notwithstanding the foregoing, petitioner contends that his investment in San Nicholas was motivated solely by the potential to earn a profit. Petitioner also contends that, taking into account the nature of his investment and the amount he invested, he exercised the due care that a reasonable and ordinarily prudent person would have exercised under like circumstances. Finally, petitioner contends that reliance on Mr. Kellen, Mr. Pace, Mr. Jacobs, and a professor at the University of California should absolve him of liability for negligence in this case. For the following reasons, we disagree with petitioner's contentions.

First, the principal flaw in the structure of San Nicholas was evident from an examination of the R&D contract and the license agreement. Both of these documents were a part of the offering memorandum. A reading of the R&D contract and the license agreement demonstrates that the license agreement

canceled, or rendered ineffective, the R&D contract because of the concurrent execution of the two documents. Accordingly, San Nicholas was never engaged in, either directly or indirectly, any research or experimentation. Rather, San Nicholas was merely a passive investor seeking royalty returns pursuant to the license agreement. See Finazzo v. Commissioner T.C. Memo. 2002-56; Kellen v. Commissioner, T.C. Memo. 2002-19; Lopez v. Commissioner, T.C. Memo. 2001-278; Christensen v. Commissioner, T.C. Memo. 2001-185; Serfustini v. Commissioner, T.C. Memo. 2001-183; Carmena v. Commissioner, T.C. Memo. 2001-177; Nilsen v. Commissioner, T.C. Memo. 2001-163; Fawson v. Commissioner, T.C. Memo. 2000-195. Any experienced attorney capable of reading and understanding the subject documents should have understood the legal ramifications of the licensing agreement canceling the R&D agreement. Petitioner failed to consult an attorney and, further, failed to carefully scrutinize the offering himself.

Second, we are unable to accept uncritically petitioner's contention that he invested in San Nicholas solely to earn a profit.[20] Rather, at the time that he signed the subscription

---

[20] It is the duty of the Court to listen to testimony, observe the demeanor of witnesses, weigh the evidence, and determine what to believe. The Court is not required to accept testimony at face value, and the Court may discount a party's self-interested testimony and place reliance on other evidence that is believed to be more reliable. See Christensen v. Commissioner, 786 F.2d 1382, 1383-1384 (9th Cir. 1986), affg. in part and remanding in part T.C. Memo. 1984-197; Niedringhaus v.
(continued...)

agreement, petitioner believed that his investment in San Nicholas offered tax benefits, and his decision to invest was influenced, in part, by that belief.

Third, we do not think that petitioner, a successful businessman and, in petitioner's counsel's words, "a man who knew about investments", exercised due care at the time that he signed the subscription agreement. In this regard we are again unable to accept uncritically petitioner's contention that he reasonably relied on the offering memorandum. The short answer to this contention is that petitioner either did not read the offering memorandum in its entirety or chose to ignore portions thereof. See Goldman v. Commissioner, 39 F.3d 402, 407-408 (2$^d$ Cir. 1994), (holding that the taxpayer's reliance on offering materials was not reasonable), affg. T.C. Memo. 1993-480; see also Pasternak v. Commissioner, 990 F.2d 893, 903 (6th Cir. 1993), affg. Donahue v. Commissioner, T.C. Memo. 1991-181, holding that claims that are probably "too good to be true" should be investigated by a reasonably prudent person.[21]

---

[20](...continued)
Commissioner, 99 T.C. 202, 212 (1992); Duralia v. Commissioner, T.C. Memo. 1994-269; see also Tokarski v. Commissioner, 87 T.C. 74, 77 (1986).

[21] The record includes a promotional videotape, produced by U.S. Agri and featuring its president Mr. Pace, that described jojoba as "liquid gold" and as "the industrial crop of the future", which would be cultivated in "some of the most hostile land anywhere". This videotape was provided to petitioner by Mr.
(continued...)

The offering memorandum was replete with caveats and warnings regarding the business and tax risks associated with an investment in San Nicholas. The cover page cautioned that "THIS OFFERING INVOLVES A HIGH DEGREE OF RISK" and warned prospective investors "NOT TO CONSTRUE THIS MEMORANDUM OR ANY PRIOR OR SUBSEQUENT COMMUNICATIONS AS CONSTITUTING LEGAL OR TAX ADVICE." Potential inventors were urged "TO CONSULT THEIR OWN COUNSEL AS TO ALL MATTERS CONCERNING THIS INVESTMENT" and were advised "TO CONSULT WITH [THEIR] OWN TAX ADVISOR AS TO THE TAX ASPECTS." The single longest section of the offering memorandum was devoted to "risk factors" and warned of numerous risks, specifically including tax risks, the lack of a structured market and distribution system for jojoba, and the highly speculative nature of the investment. Petitioner ignored these warnings, reasoning that "I felt that what I had done to investigate the thing * * * was a reasonable amount of checking for what I invested  * * * ".

On brief, petitioner painstakingly dissects portions of the offering memorandum in an attempt to show that he carefully perused what he calls a "business plan". Petitioner's piecemeal approach to the offering memorandum ignores the existence of the strong cautionary language. A careful review of the offering memorandum, especially the portion discussing the tax risks,

---

[21](...continued)
Pace.  See supra note 6.

would have caused a prudent investor to question the propriety of the tax benefits. We would certainly expect no less from an individual described by his counsel as "an astute businessman".

Petitioner contends that his experience with farming and his reading about jojoba gave him confidence in the viability of his investment in San Nicholas. Petitioner essentially compared and equated the production costs of jojoba found in the articles he read with his own knowledge of citrus groves, and concluded that the jojoba industry would be profitable. Yet, had petitioner delved deeper into the nature of his investment, he would have inquired into both the operational aspects of the partnership and the nature of the research that U.S. Agri was to conduct under the terms of the R&D contract.[22] See Fawson v. Commissioner, T.C. Memo. 2000-195.

Petitioner contends that he visited jojoba plantations before he invested in San Nicholas and that such visits demonstrate due care in making the investment. Yet the record suggests that petitioner's visits to the plantations were, at best, incidental to other business that he had in the Desert

_____

[22] We find it curious that petitioner would choose to emphasize his experience in farming when the record clearly demonstrates that he did not have any experience in either the farming of jojoba or the research or development of jojoba. In addition, petitioner's professed experience in farming was essentially limited to some orange groves, which produced a gross profit of $262 in 1983, and a family-owned ranch in northern California that was operated, before it was sold in 1980, by his father.

Center area.[23]  In any event, petitioner's principal interest in the plantations appears to have been to determine how the jojoba plants were developing.  There is no persuasive evidence in the record to demonstrate that petitioner visited the plantations in order to determine whether research or development was being conducted.  If petitioner had visited the plantations for that purpose, he would have quickly discovered that U.S. Agri was engaged in nothing more than a farming activity.  See Kellen v. Commissioner, T.C. Memo. 2002-19; Fawson v. Commissioner, supra. Petitioner should have realized that in the absence of any research and development, there could be no deduction for research and experimental expenditures under section 174.

Fourth, petitioner contends that reliance on Mr. Kellen, Mr. Pace, Mr. Jacobs, and a professor at the University of California should absolve him of liability for negligence in this case.  We disagree that any such reliance was reasonable; rather, the record demonstrates that petitioner failed to obtain competent, independent, professional advice before investing in San Nicholas.

---

[23] Petitioner testified on direct examination as follows:

we pulled some gas tanks out of our rental yard, and I sold them to [Mr.] Jacobs and took them down to the Desert Center because he was going to use them.  Well, he was going to use one for water and one to store diesel in.  So, I was down there then and a couple of other times.

Petitioner contends that he reasonably relied on advice from Mr. Kellen. Yet petitioner never consulted Mr. Kellen as an attorney but rather as a friend and business associate; moreover, petitioner characterized his dialogue with Mr. Kellen as "chat".[24] Regardless, petitioner argues that Mr. Kellen was qualified as an expert in jojoba. To the contrary, Mr. Kellen did not consider himself to be an expert in jojoba in 1983, an admission borne out by the record. In this regard, the record establishes that Mr. Kellen became involved in the farming of jojoba only in or about 1982, so his experience was limited, and there is nothing to indicate that he was knowledgeable about research and development of jojoba. See Kellen v. Commissioner, supra; see also Freytag v. Commissioner, 89 T.C. at 888.

The record also establishes that Mr. Kellen was the general partner and tax matters partner of four other jojoba partnerships, including Utah Jojoba. See supra "B". Mr. Kellen was also the close personal friend and business associate of Mr. Pace, the president and a director of U.S. Agri, which

---

[24] To the extent that the "chat" was focused on any particular matter, it appears to have focused on the profit projections in the offering memorandum. However, the offering memorandum specifically warned that such projections had been prepared for the general partner, had not been audited, and should not be relied on. See supra "H". In addition, we have previously found that Mr. Kellen's "analysis" of San Nicholas was not based on anything other than the projections set forth in the offering memorandum. Kellen v. Commissioner, T.C. Memo. 2002-19; see Tokarski v. Commissioner, 87 T.C. 74, 77 (1986).

corporation was the R&D contractor and licensee of San Nicholas and other jojoba partnerships. Indeed, at one time, Mr. Kellen was also a director of U.S. Agri. Accordingly, any advice that Mr. Kellen may have given was essentially that of an insider or promoter, which advice is inherently suspect. E.g., Addington v. Commissioner, 205 F.3d at 59; Pasternak v. Commissioner, 990 F.2d at 903.

Petitioner also contends that he reasonably relied on advice from Mr. Pace, the individual who furnished him with the offering memorandum and promotional videotape. At the time of trial, Mr. Pace was deceased; accordingly, we do not know first hand what knowledge he may have had or what advice he may have given.[25] The record does establish that Mr. Pace was the president of U.S. Agri and a member of its board of directors. Petitioner, who was Mr. Pace's friend and business associate, was aware that Mr. Pace was an interested party and that Mr. Pace had a conflict of interest.

Reliance on promotional materials furnished by the promoter of the partnership or by an interested party does not constitute due care. See, e.g., Addington v. Commissioner, 205 F.3d at 59 ("It is unreasonable for taxpayers to rely on the advice of someone who they should know has a conflict of interest.").

_____

[25] In Utah Jojoba I Research v. Commissioner, T.C. Memo. 1998-6, the Court found that before 1983, Mr. Pace had only limited knowledge of, and minimal background in, jojoba.

Thus, whatever advice petitioner may have received from Mr. Pace fails as a defense to negligence because of Mr. Pace's lack of competence to give such advice and the clear presence of a conflict of interest. See Goldman v. Commissioner, 39 F.3d at 408; LaVerne v. Commissioner, 94 T.C. 637, 652-653 (1990), affd. without published opinion 956 F.2d 274 (9th Cir. 1992); Rybak v. Commissioner, 91 T.C. 524, 565 (1988); Barlow v. Commissioner, T.C. Memo. 2000-339; see also Weitzman v. Commissioner, T.C. Memo. 2001-215, wherein we stated that "The fact that * * * [the putative adviser] introduced the partnership investment to petitioner should have put petitioner on guard that * * * [the putative adviser] was engaged in selling rather than acting as an independent adviser."

Petitioner also contends that he reasonably relied on advice from Mr. Jacobs. At the time of trial, Mr. Jacobs was deceased; accordingly, we do not know first hand what knowledge he may have had or what advice he may have given. The record does establish that Mr. Jacobs only became interested in the farming of jojoba in 1982, so his experience was limited, and he did not have any experience or expertise in the research or development of jojoba. See Freytag v. Commissioner, 89 T.C. at 888. The record also establishes that Mr. Jacobs was involved in the sale of limited partnership interests in a number of jojoba partnerships. Accordingly, any advice that he may have given can be analogized

to that of insider or promoter, which advice is inherently suspect.  E.g., <u>Addington v. Commissioner</u>, 203 F.3d at 59; <u>Pasternak v. Commissioner</u>, 99 F.2d at 903.

In <u>Glassley v. Commissioner</u>, T.C. Memo. 1996-206, we found that the taxpayers:

> acted on their fascination with the idea of participating in a jojoba farming venture and their satisfaction with tax benefits of expensing their investments, which were clear to them from the promoter's presentation.  They passed the offering circular by their accountants for a "glance" * * *.

The record in the present case suggests that whatever advice may have been given by Mr. Jacobs was nothing more than a generalized affirmation to invest in jojoba.  Indeed, at trial, petitioner testified that Mr. Jacobs "thought * * * the investment was very good".

Petitioner also contends that he reasonably relied on advice from a professor at the University of California at Riverside, a Dr. Yermanos, an individual whom petitioner regards as an expert in jojoba.[26]  Yet petitioner admits that he met this individual only once and that he showed him no documentation whatsoever.  Indeed, there is nothing in the record to suggest that petitioner ever discussed the details of San Nicholas with Dr. Yermanos or that Dr. Yermanos even knew about the existence of the

---

[26] We note that this individual did not testify at trial, so we know essentially nothing about him.  We also note that no mention is made of a "Dr. Yermanos" in <u>Utah Jojoba I Research v. Commissioner</u>, T.C. Memo. 1998-6.

partnership. Equally significant, the record suggests that petitioner's conversation with Dr. Yermanos was, at best, incidental to other business that petitioner had in the area, as the following colloquy between petitioner and respondent's counsel demonstrates:

> Q: This Dr. Yermanos, where was he--where was he located?
>
> A: He was with the University of California at Riverside in the Ag--I don't know how familiar you are with Riverside, but they have a complete research--oh, there originally was probably 300 acres in there that they--you know, they--oh, what do I want to say, they experiment. Well, they put like greenhouses over a citrus tree and then give it a disease and see what it does. So, it's a research area that the University of California uses and it's an ag research.
>
> Q: And you said you spoke with him once?
>
> A: That's correct, yeah.
>
> Q: What did you show him, anything?
>
> A: No. He--basically, I had a friend of mine who did these greenhouses. The Luminex Corporation built these greenhouses, and I was out there seeing him, and he was out there by where the plants were and stuff, and so I talked to him, you know, asked him about--you know, questions about it.
>
> Q: Okay. And so you didn't have an appointment to meet him or anything.
>
> A: No. No, I did not.

In short, there is simply nothing in the record to indicate that this individual at the University of California provided any advice to petitioner that would absolve him from liability for the additions to tax for negligence.

Finally, petitioner relies heavily on <u>Krause v.</u>
<u>Commissioner</u>, 99 T.C. 132 (1992), affd. sub nom. <u>Hildebrand v.</u>
<u>Commissioner</u>, 28 F.3d 1024 (10th Cir. 1994). That case, however,
is distinguishable on its facts.

In <u>Krause v. Commissioner</u>, <u>supra</u>, we held for the taxpayers
on the issue of negligence. We did so in the context of oil
recovery technology based on special or unusual circumstances
related to the energy and oil crisis of the late 1970s and early
1980s:

> In evaluating the imposition of the additions to tax
> in this case, and in light of the above facts
> (encouraging investments in and the development of
> tertiary oil recovery methods such as * * * [enhanced
> oil recovery] technology), we are somewhat
> understanding of the individual investments that were
> made in * * * Partnerships. In the context of the
> hysteria relating to the energy crisis, the oil price
> increases of the late 1970s, the industry and the
> governmental interest in * * * [enhanced oil recovery]
> technology, the heavy and sophisticated promotion of
> these investments * * * we conclude that petitioners
> are not liable for the additions to tax and the
> additional interest element for negligence under
> sections 6653(a), 6653(a)(1) and (2). [<u>Id.</u> at 178.]

None of the circumstances that were determinative in <u>Krause</u>
<u>v. Commissioner</u>, <u>supra</u>, are present in the case at bar.
Petitioner's reliance on the cited case is misplaced.

In view of the foregoing, we hold that petitioner is liable
for the additions to tax under section 6653(a)(1) and (2) for
negligence. Respondent's determination is sustained.

II.  Section 6661(a) Substantial Understatement of Tax Liability

The second issue for decision is whether petitioner is liable for an addition to tax under section 6661(a).  That section, as amended by the Omnibus Budget Reconciliation Act of 1986, Pub. L. 99-509, sec. 8002, 100 Stat. 1951, provides for an addition to tax of 25 percent of the amount of any underpayment attributable to a substantial understatement of income tax. Petitioner bears the burden of proving that he is not liable for the addition to tax.  Monahan v. Commissioner, 109 T.C. 235, 257 (1997); Mueller v. Commissioner, T.C. Memo. 2001-178.[27]

A substantial understatement of income tax exists if the amount of the understatement exceeds the greater of 10 percent of the tax required to be shown on the return, or $5,000.  Sec. 6661(b)(1)(A).  Generally, the amount of an understatement is reduced by the portion of the understatement that the taxpayer shows is attributable to either (1) the tax treatment of any item for which there was substantial authority or (2) the tax treatment of any item with respect to which the relevant facts were adequately disclosed on the return.  See sec. 6661(b)(2)(B).

Substantial authority exists when "the weight of the authorities supporting the treatment is substantial in relation to the weight of authorities supporting contrary positions." Sec. 1.6661-3(b)(1), Income Tax Regs.  Adequate disclosure of the

---

[27] See supra note 19.

tax treatment of a particular item may be made either in a statement attached to the return or on the return itself. Sec. 1.6661-4(b) and (c), Income Tax Regs.

If an understatement is attributable to a tax shelter item, then different standards apply. First, in addition to showing the existence of substantial authority, a taxpayer must show that he or she reasonably believed that the tax treatment claimed was more likely than not the proper treatment. Sec. 6661(b)(2)(C)(i)(II). Second, disclosure, whether or not adequate, will not reduce the amount of the understatement. Sec. 6661(b)(2)(C)(i)(I).

Petitioner appears to concede that there was a substantial understatement of tax within the meaning of section 6661(a).[28] Petitioner does not contend, however, that there was substantial authority supporting the deduction of the partnership loss that he claimed on his return, nor does petitioner contend that there was adequate disclosure of the facts related to that loss. Rather, petitioner contends that he should be absolved of liability for the addition to tax by virtue of section 6661(c).

---

[28] We note that the understatement of tax on which respondent determined the addition to tax is $5,435. The amount required to be shown as tax on petitioner's return is $51,478. The understatement is therefore "substantial" because it exceeds the greater of 10 percent of the amount required to be shown on the return, or $5,000. Sec. 6661(a).

Section 6661(c) vests the Commissioner with discretion to waive the addition to tax under section 6661(a) if the taxpayer shows that he or she acted with reasonable cause and in good faith. The Commissioner's failure to waive the addition to tax is reviewed by this Court for abuse of discretion. <u>Martin Ice Cream Co. v. Commissioner</u>, 110 T.C. 189, 235 (1998).

There is nothing in the record to suggest that petitioner ever requested that respondent waive the addition to tax under section 6661(a). Indeed, petitioner does not even allege that he requested such a waiver. For that reason alone, we cannot find that respondent abused his discretion in failing to waive the addition to tax. See <u>McCoy Enters., Inc. v. Commissioner</u>, 58 F.3d 557, 563-564 (10th Cir. 1995), affg. T.C. Memo. 1992-693; <u>Finazzo v. Commissioner</u>, T.C. Memo. 2002-56; <u>Klieger v. Commissioner</u>, T.C. Memo. 1992-734; sec. 1.6661-6, Income Tax Regs.

Even if petitioner had requested a waiver under section 6661(c), the record demonstrates that he failed to act reasonably and in good faith in deducting the claimed loss from San Nicholas. Petitioner's failure to adequately investigate San Nicholas or to seek independent, competent advice about the partnership demonstrates a lack of reasonable cause and good faith. See <u>Finazzo v. Commissioner</u>, <u>supra</u>; <u>DePlano v. Commissioner</u>, T.C. Memo. 1998-303.

In view of the foregoing, we hold that petitioner is liable for the addition to tax under section 6661(a) for substantial understatement of tax liability.  Respondent's determination is sustained.

III.  Conclusion

Reviewed and adopted as the report of the Small Tax Case Division.

To reflect our disposition of the disputed issues, as well as the parties' concessions, see supra note 2,

Decision will be entered for petitioner in docket No. 6294-00S.

Decision will be entered for respondent in docket No. 6302-00S as to the additions to tax under sections 6653(a)(1) and 6661 as determined in the notice of deficiency and as to the addition to tax under section 6653(a)(2) as claimed in respondent's answer.